**ABINGTON TEXTILE MACHINERY
WORKS, Plaintiff,**

v.

**CARDING SPECIALISTS (CANADA)
LIMITED, Defendant.**

C. A. No. 2357–62.

United States District Court
District of Columbia.

Dec. 21, 1965.

Robert L. Thompson, Sewall P. Bronstein, Dike, Thompson, Bronstein & Mrose, Boston, Mass., John W. Malley, Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

James C. McKay, Paul F. McArdle, Covington & Burling, Washington, D. C., Stuart A. White, Lawrence J. Swire, Ward, Haselton, McElhannon, Orme, Brooks & Fitzpatrick, New York City, for defendant.

JACKSON, District Judge.

This is an action for a declaratory judgment of invalidity of claims 1 to 4 of defendant's United States patent No. 3,003,195 for "METHOD OF AND APPARATUS FOR THE TREATMENT OF COTTON FIBERS", and for a further declaratory judgment that the ROLAKLEEN device manufactured and sold by plaintiff for installation in existing cotton carding machines does not infringe United States patent No. 3,003,-195. Process was served upon defendant pursuant to 35 U.S.C. § 293. Defendant counterclaims for damages for past infringements and for an injunction against further infringements by plaintiff.

Defendant is the assignee of inventor Andre Varga's application Serial No. 771,050, filed October 31, 1958, with a claim to right of priority under 35 U.S.C. § 119 of a British application filed for the same invention on November 26, 1957. On October 10, 1961 said application Serial No. 771,050 matured into United States patent No. 3,003,195, the patent in suit.

The essence of the Varga invention consists in the placement of at least one pair of impurity crushing rolls between the doffer and calender rolls at the end of a conventional single cylinder cotton carding machine, or card, so that the crushed impurities will fall out in subsequent processing. The carding operation is an intermediate stage in a cotton mill, occurring subsequent to the opening and picking stages, and prior to drawing and spinning. The raw material lint cotton which the cotton mill processes into yarn has previously been either hand picked or mechanically harvested, and then ginned to remove the seed cotton.

Claim 3 of the patent in suit is illustrative of the invention and reads as follows:

3. A cotton carding machine having a doffer, a pair of calender rollers, a pair of smoothly ground ironing rollers between said doffer and said calender rollers adapted to receive a carded web in substantially full width from the doffer, load means pressing said ironing rollers together with sufficient force to crush small impurities in said web, drive means rotating said ironing rollers at a speed sufficient to take up slack in the web between the doffer and said ironing rollers, and drive means rotating said calender rollers at a sufficiently greater surface speed than said ironing rollers to cause relative longitudinal fiber movement in said web between said crushing and calender rollers.

Claim 2, upon which defendant also relies in its counterclaim for infringement, differs from claim 3 in that the smoothly ground ironing rollers are recited as "impurity crushing rollers" and the "load means" element is eliminated from the combination of claim 2.

Claim 1 is directed to a new method of treating cotton fibers and reads as follows:

1. A method of treating cotton fibres comprising the steps of forming the fibres into a thin carded web, passing said web through crushing rollers adapted to crush small impurities in the web and subjecting said web on leaving said crushing rollers to a longitudinal drafting action sufficient to cause relative longitudinal fiber movement in the web.

Apparatus claims 4 and 5 are directed to equivalent modifications of the crushing rolls arrangement.

Claims 1 to 3 of the patent in suit were held invalid *in personam* on August 27, 1964 by the United States District Court for the Middle District of Georgia in Carding Specialists (Canada) Limited v. Lummus Cotton Gin Co., et al., 234 F. Supp. 444, 142 USPQ 454 (hereinafter referred to as the Georgia case). In that case, Judge Elliott also held that, even if the patent were valid, the accused trashmasher device manufactured and sold by defendant Lummus Cotton Gin Co. would not infringe the claims of the patent.

While the accused ROLAKLEEN device manufactured and sold by plaintiff Abington is, of course, different from the trashmasher machine, the prior art relied upon by plaintiff in this case to invalidate United States patent No. 3,003,195 is essentially the same as that relied upon by the defendant in the Georgia case. However, the Court is of the opinion that the record in the instant case is considerably more detailed than that in the Georgia case with respect to the many differences between the four relevant processing systems involving the natural fibers cotton and wool. Defendant's expert witnesses Thorndike and Burditt testified at considerable length in this case as to the vast differences between the woolen and worsted systems for the processing of wool fibers, and the cotton condenser (or cotton waste) and fine cotton systems for processing cotton fibers. While the similarities between the various systems for processing these natural textile fibers, or combinations thereof, are such that the four systems may be considered analogous arts, the Court is convinced that the differences between the four systems are such that the use of a particular mechanical device in one system does not constitute an anticipation under 35 U.S.C. § 102 of the same device in a different system since "the invention" (as required by 35 U.S.C. § 102) is not "disclosed or described". This is particularly true when the prior art use of the device occurs in the woolen or worsted systems used for processing a fiber, namely wool, with which the invention of the patent in suit is not concerned. The real issue in this case, at least with respect to the prior art, is whether, under 35 U.S.C. § 103, "the differences between the subject matter * * * patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains".

Applying this objective obviousness test of 35 U.S.C. § 103 to the facts of the present case, the issue is whether the differences between the placement of crushing rolls on a conventional single cylinder cotton card in the fine cotton system and the prior art usages of analogous crushing rolls in the analogous woolen, worsted, and cotton condenser systems are such that the subject matter of claims 1 to 5 (and especially claims 2 and 3 which are relied upon by the defendant in its counterclaim for infringement) of the patent in suit, taking this subject matter as a whole, would have been obvious at the time the invention was made, namely in 1957 [1], to a person having ordinary skill in the art to

---

1. The defendant has established as the date of invention under 35 U.S.C. § 104, November 26, 1957, the filing date of the British counterpart application for the same invention.

which such subject matter pertains, namely, the fine cotton processing system, and particularly the carding operation thereof.

It should be emphasized that the legal standard of reference must be the person having "ordinary" skill in the art. Plaintiff's expert witness Bogdan, a professor in the School of Textiles at North Carolina State College, can scarcely be regarded as a man of merely "ordinary" skill in the pertinent art. To regard him as such would be an insult to Professor Bogdan, who is in fact a person having *extraordinary* skill in the art. The professor testified at the trial that the claimed subject matter of the patent in suit would have been personally obvious to him in 1957, and the Court has no reason to doubt that this is so, but the fact remains that a great many things would be personally obvious to Professor Bogdan that would not at all have been obvious to a person having merely "ordinary" skill in the fine cotton process, particularly the carding operation thereof, "at the time the invention was made" in 1957.

■■ The test of obviousness under 35 U.S.C. § 103 is an objective one. It is not a subjective test of "invention". In this regard it would also be immaterial whether or not the claimed subject matter was personally obvious to inventor Varga. Thomas Edison was justifiably granted many patents for inventions, at least some of which must have been personally obvious to him as a genius. It is likewise immaterial whether or not the claimed subject matter would have been personally obvious to any judge in 1957, unless the particular judge also happened to be "a person having ordinary skill in the art to which said subject matter pertains."

In seeking to invalidate the patent in suit, plaintiff relies upon 34 prior art patents and printed publications, as well as the prior use of a ROLASLIVUP device manufactured, sold, and installed in cotton mills by plaintiff at least as early as November 24, 1956. None of the principal references relied upon by plaintiff here was cited by the Patent Office during prosecution of the Varga application, probably because it is the usual practice of Examiners to search only the most relevant subclasses, which in this case would be those subclasses pertaining to fine cotton processing.

THE VARGA INVENTION

As previously mentioned, the Court is convinced that the essence of the Varga invention claimed in the patent in suit consists in the application of the crushing principle (known in the prior art woolen, worsted, and cotton condenser systems to be useful for crushing impurities in a web of textile fibers, the crushed impurities being removed in subsequent operations, chiefly further carding) to the fine cotton processing system, the relevant art to which the claimed subject matter pertains. Whether the application of this principle would have been obvious in 1957 to a person having ordinary skill in the art, namely, a typical card operator in a fine cotton processing mill, is the real issue to be decided in determining whether or not the patent in suit is valid.

Although plaintiff devoted a considerable amount of time at the trial and in briefs to the subjects of:

1. the relative surface speeds at which the calender rolls and crush rolls are rotated with respect to each other and to the doffer, and

2. the "relative longitudinal fiber movement" in the web of fibers between the crush rolls and the calender rolls,

the Court is of the opinion that these factors are of comparatively little significance when compared to the true essence of the invention, which is the placing of crush rolls at the end of a conventional fine cotton processing card, so that there is *no further carding operation* subsequent to the crushing of impurities in the web.

With regard to the surface speeds, the crush rolls may be rotated at either a faster or slower surface speed than that of the doffer, in order to take up slack

in the web, but the calender rolls are invariably rotated at a faster surface speed than that of the crush rolls, due to the necessities of pulling the web away from the sticky surfaces of the crush rolls, and further pulling the web through the usual condensing trumpet located just prior to the calender rolls. The condensing trumpet serves the purpose of condensing the fibrous web, approximately forty inches or more wide, into a rope-like sliver. While the calender rolls must be rotated at a faster surface speed than the crush rolls, the excess surface speed must not, of course, be so much as would break or damage the web.

The Court discovers ample evidence in the record to find that determination of the optimum relative surface speeds of the doffer, crush rolls, and calender rolls would be well within the ordinary skill of a typical cotton mill card operator, who would vary the surface speeds according to prevailing conditions.

With regard to "relative longitudinal fiber movement", the necessity of rotating the calender rolls at a faster surface speed than that of the (plaintiff's RO-LAKLEEN or defendant's CROSROL) crush rolls invariably results in some longitudinal stretching of the fibrous web between the nips of the pairs of rolls rotating at different surface speeds. When anything is stretched, be it a rubber band or a web of fibers, something must "give." The "giving" in the case of a web of fibers must obviously produce a rearrangement, or relative movement, of the fibers which compose the web. Since a longitudinal stretch is imparted to the web, i. e., a stretch in the lengthwise direction of travel of the moving web, the relative movement of the fibers within the web must necessarily be a "relative longitudinal fiber movement."

Plaintiff's position as to the essence of the Varga invention is that it would have been obvious to transplant to this fine cotton system either the Harmel burr crushers used in the worsted system and known in that art since 1885, or the Peralta crush rolls used in the woolen and cotton condenser (cotton waste) systems and known to these arts since 1937. At first glance it might appear that it would in fact be obvious to transplant either or both of these devices to the fine cotton processing system with which the patent in suit is concerned. However, a thorough examination of the matter has convinced the Court that it would not be obvious under 35 U.S.C. § 103 to transplant these crushing devices from the different prior art systems to the fine cotton processing system for a number of reasons.

## HARMEL BURR CRUSHERS

With respect to the Harmel burr crushers, the basic patent on this device (Harmel U. S. Patent No. 318,730) issued in 1885. The disclosure of this Harmel patent, which is one of the principal references relied upon by plaintiff, is primarily directed to the *worsted* system for processing *wool* fibers. It is the essential teaching of this Harmel patent that crushing occurs at an intermediate stage of the carding operation. In other words, the burr crushers must be located between breaker and finisher parts of the card (or between two breakers) so that the crushed impurities may be removed during *subsequent* carding in the finisher (or second breaker) part of the card. Although there is a brief reference to the possible use of several of these Harmel burr crushers at different locations, this disclosure must be given a reasonable interpretation that is not inconsistent with other disclosures, especially those of importance, in the patent specification. Therefore, the Court finds that the reference (read out of context at the trial) to the use of more than one of these Harmel burr crushers in multiple cards must be interpreted in a manner such that there is always at least one carding operation following the last burr crusher in the card set, "during which carding operation the crushed * * * particles in the fiber are separated and fall out."

While the Harmel patent discloses that the surface of the crush rolls may be either fluted or smooth, Harmel preferred

"to flute one or more of the rolls," and it is a fact that in the practical operation of these Harmel burr crushers in the worsted system the top rollers are fluted and only the bottom roller is smooth-surfaced, as a general rule. Furthermore, as a matter of *practical* operation, the prior art Harmel burr crushers in the worsted system at the time of the Varga invention were generally located at a position such that there was subsequent carding following crushing of the impurities.

While the prior art included suggestions (e. g. "Textile Manufacturer" June 1956, pp. 295–7) that the Harmel burr crushers might be located at the end of the worsted card set without subsequent carding, in which use the crushed burrs were removed during the gilling and combing steps in the worsted system, the Court finds that this suggestion met with disfavor by practical men experienced in the art of worsted carding at the time the Varga invention of the patent in suit was made in 1957. Griffin, "Practical Worsted Carding", London, 1957, pp. 135–138.

When a man of ordinary skill in a particular art has a problem which he is unable to solve by means available in his particular art, and he is forced to look to analogous arts for a solution of the problem, it is most unlikely that he would adopt an approach which was itself regarded at the time as impractical in the analogous art. Even though the occasional use of Harmel burr crushers at the end of the card set in the worsted system is disclosed by the 1956 Textile Manufacturer publication, the Court believes that it would not have been obvious to a practical man of ordinary skill in the fine cotton processing art in 1957 to transplant this crushing principle from the worsted system by placing Harmel burr crushers, or equivalent crush rolls, at the end of the cotton card in the fine cotton processing system.

This is especially true in view of the 1957 book by Griffin, "Practical Worsted Carding," which contains the following statement at page 138:

"A Harmel burr crusher only functions properly when the wool is in the form of a web, and since further carding is necessary to break the burrs, the only part of the card where it can be employed is between the first doffer and second swift (carding cylinder)."

Even the publications relied upon by plaintiff to show that the use of burr crushers at the end of the worsted card set was old in 1957 (and that, therefore, the use of crush rolls at the end of the cotton card should be held to be obvious), contain red danger flags which would warn the practical man against the use of these devices on cotton webs. The June, 1956 Textile Manufacturer article on the Bradford and Continental systems of worsted (combed wool) carding discloses at page 297 the fact that the crushers produce "considerable fibre breakage." Similarly, the "Wool Year Book and Diary," Manchester, 1918–19, discloses at page 145 the fact that the motion of the Harmel burr crushers "is somewhat severe in its action on the wool." Speaking of the placement of the Harmel device "at the end of the carder", on the next page, this reference states "The danger of such action on fibres * * * being too severe and leaving the fibre weak and limp."

In view of the fact that the coarse, resilient wool fiber can endure more punishment in processing than the cotton fiber can, the Court is of the opinion that the net result of these prior art disclosures of the use of Harmel burr crushers at the end of worsted cards would be to frighten the cotton mill owner, and the cotton card operator, away from the use of similar crushing devices at the end of the conventional cotton card, or anywhere else in the fine cotton mill for that matter.

Before turning to the Peralta crush rolls, the Court notes that 72 years elapsed between issuance of the Harmel patent in 1885 and the Varga invention in 1957, and no one prior to Varga had actually applied the Harmel burr crushers to the fine cotton processing system,

insofar as the record in this case shows. This long lapse of time is itself indicative that it was unobvious to transplant these Harmel burr crushers, or the principle of their operation, from one fiber system to another.

## PERALTA CRUSH ROLLS

With regard to the Peralta crush rollers, these devices were available to the public at least since 1937, in which year United States patent No. 2,075,156 issued to Antonio Peralta Albero, the Spanish inventor for whom these rollers were named. The Peralta crush rollers are more analogous to the crushing rolls contemplated by the invention of the patent in suit in that both rollers have smooth surfaces, unlike the Harmel burr crushers which, in practice, are operated on the worsted system with at least one and usually two fluted (channelled surface) rollers. Although the Peralta patent is silent as to the particular textile fibers, or more importantly, the particular fiber processing systems in which the Peralta rollers are designed to operate, testimony at the trial of this case by defendant's witness Thorndike established the fact that the Peraltas are used in the woolen and cotton condenser systems; and the fibrous webs of these systems, after passing through the Peralta rollers, were invariably subjected to further carding operations during which the crushed impurities were removed. There was evidence that attempts had been made to employ Peralta crush rolls in the worsted system, but these attempts had proved unsuccessful at the time of the Varga invention in 1957 for two principal reasons (see also Griffin, "Practical Worsted Carding," pp. 137–8, to the same effect).

Firstly, the Peralta rolls are designed to operate at what truly may be called "crushing" pressures. This great pressure tends to damage the wool fibers in the worsted system, producing a large amount of short wool fibers, or noils, which are combed out in the worsted process subsequent to final carding. It is undesirable to use any device in the worsted system which materially increases the amount of short fibers, since this will produce serious reduction in the yield of worsted (combed wool) yarn ultimately obtained from the process.

Secondly, with the use of the comber in the worsted process (which should not be confused with the doffer comb, or fly comb, adjacent to the doffer), it is easier to remove relatively large impurities which have not been thoroughly crushed by the heavy pressures applied to Peralta crush rolls. However, it is appreciably more difficult for the comber in the worsted process to remove relatively small bits of crushed trash, e. g., impurities in nearly powdery form.

The Court finds, upon comparison of the four different processing systems, that the worsted process may be called more truly analogous to the fine cotton process than either of the other two systems (woolen and cotton condenser processing). In both the worsted and fine cotton processes, for example, the carded web from the last doffer is drawn through a condensing trumpet to form a sliver, which is thereafter subjected to drawing and spinning operations. Likewise, just as a comber is used subsequent to carding in the worsted process for producing combed wool yarns, a comber is often similarly used in the fine cotton process to produce combed cotton yarns. Since the smooth-surfaced Peralta crush rolls of the prior art woolen and cotton condenser systems are considered by the Court to be more analogous, as mechanical devices, to the crush rolls contemplated by the invention of the patent in suit than are the Harmel burr crushers, the Court finds that it would not have been obvious in 1957 to a cotton mill worker of ordinary skill to apply these Peralta crush rollers to the fine cotton processing system, in view of the adverse results obtained in the worsted system with these prior art Peralta crush rollers, the worsted system being, as previously stated, more analogous (at least with regard to operations subsequent to carding) to the fine cotton system than either of the other two processes, i. e., woolen and cotton condenser processing, the lat-

ter two resembling each other more than they resemble either of the other two systems in operations subsequent to carding.

■ With regard to the CROSROL rollers manufactured and sold by defendant's related British company, Carding Specialists Co. Limited, plaintiff relies upon certain advertisements for these smooth-surfaced Peralta-type rollers published in early 1957 as prior art. These 1957 advertisements are, of course, available as prior art under 35 U.S.C. § 119 due to the fact that their dates are more than one year prior to the actual United States filing date of defendant's patent application. These Peralta rollers involve the principle of crossing or skewing the axes of the rollers and were marketed under defendant's generic trade name CROSROL. Although these advertisements of defendant contain references to cotton, which taken out of context might be regarded as an anticipation of the use of crushing rolls in the fine cotton process, the Court finds that it is clear from reading the entire texts of these advertisements that the various references to cotton refer to either (1) the processing of virgin cotton through woolen cards (the 1948 Marshall article established the fact that 100% cotton could be so processed) with which the CROSROL WP (woolen purifier) is used, or (2) the processing of cotton waste or virgin cotton through cotton condenser (or cotton waste) cards with which the CROSROL CWP (cotton waste purifier) is employed.

By way of examples, the March, 1957 "Woolen Machinery Bulletin" (plaintiff's exhibit 11, tab 6) states that the CROSROL machine may be used to remove impurities in "wool, wool waste, shoddy, cotton waste, cotton, etc." The November, 1948 article by Marshall in the "Textiles Manufacturer" entitled "The Peralta Machine in Woolen Carding" had already established the fact that "blends containing 100% cotton" could be processed with Peraltas in the woolen system, in which there was invariably (in 1957, at least) a carding operation subsequent

to crushing. The Marshall article also contained the warning that "cotton fibre is not as resilient as wool and incorrect treatment might easily damage it, * * *."

Plaintiff contends that the advertising statement that "ironing effect is achieved by the smooth precision ground rollers resulting in a marked improvement in drafting and spinning" would suggest that the CROSROLS are located at the end of the card, since otherwise the ironing effect would not persist through a subsequent carding operation. The fact that the ironing effect does persist through subsequent woolen or worsted carding to "increase the spinning properties of the fibres generally" is shown by the 1943 Varga patent No. 2,323,167, which was cited by the Patent Office during prosecution of the application for the patent in suit.

Page 7 of the March, 1957 "Woolen Machinery Bulletin" contains an advertisement for "The Lightweight CROSROL Web Purifier Machine W.P.IV," which asserts that the new W.P. (woolen purifier) "is also used in the Cotton Waste Industry owing to the fact that even the cotton seed skin is destroyed at low pressure that does not damage the cotton fibre, a fibre which lacks the resilience of wool."

■ As previously mentioned, virgin cotton may be, and has been, processed in both the woolen and cotton condenser systems. However, the prior art Peralta crush rolls, including defendant's CROSROLs, were (at the time of the Varga invention in 1957) invariably utilized in these two systems at an *intermediate* stage of carding, so that there was always subsequent carding to remove crushed impurities after the web passed through the nip of the crush rolls. Thus, defendant's prior art advertisements cannot be regarded as rendering obvious the use of crushing rollers in the fine cotton processing system, in which there is ordinarily no subsequent carding after the crushing of impurities. This absence of subsequent carding in the fine cotton

process is not merely a matter of choice of location for the crushing rollers.

Plaintiff contends that, since the conventional single cylinder cotton carding machine commonly used in fine cotton mills provides a web at only one location (between the single doffer and the calender rolls) in the card, therefore the obvious place to insert the crush rolls would be where this web is present. The Court agrees with plaintiff that this is the obvious place to insert these crush rolls, once the decision has been made to install crush rolls on a conventional cotton card, but the real issue is whether such an application of the crushing principle to the fine cotton process would have been obvious in the first place to a person having ordinary skill in that art in 1957. Nothing in this world is more obvious than that which is obvious by hindsight *after* the fact of making an invention.

Since the crushed impurities are not, for the most part, removed at the crushing rolls themselves in the analogous prior art systems, being removed primarily during subsequent carding, the man of ordinary skill in the fine cotton processing art would probably have concluded in 1957 that the use of the Peralta crush rollers in the fine cotton system would not successfully accomplish the desired *removal* of trash, but that the crushed impurities would be carried forward in the sliver, and they would therefore be present in the spun cotton yarn, and the cotton fabric ultimately woven from this yarn. At least, the Court believes that this is what would have been obvious to the man of ordinary skill in the fine cotton art who might have thought in 1957 of placing Peralta crush rolls at the *end* of the conventional cotton card, i. e., at a point in the mill where there was no subsequent cleaning point (other than the comber used for making combed cotton yarn) recognized as such at the time of the 1957 Varga invention. In addition to his discovery that crush rolls may be located at the end of the conventional cotton card in the fine cotton process, inventor Varga also believed

that, by slightly stretching the web between the crush rolls and calender rolls (through which the condensed silver passes on the way to the coiler can and thence to the draw frame), this slight stretching of the web (which produces a "relative longitudinal fiber movement," that is, a movement of the fibers relative to one another in the longitudinal direction of travel of the web) would loosen the crushed impurities from the fibers so that the crushed trash would fall from the sliver, roving, and yarn in the subsequent drafting, spinning, and weaving operations, which (prior to the Varga invention in 1957) were not recognized by ordinarily skilled workers in the fine cotton processing art as significant cleaning operations.

Plaintiff relies upon a 1943 patent to Chantler, No. 2,326,331 which is not particularly relevant to the real invention made by Varga (i. e. the application of crush rolls subsequent to final carding in the fine cotton process) as shown by the title of the reference patent, "Drawing-off Arrangement or Mechanism for Dealing with a Fleece *Intermediate* of Scribblers or Carding Engines." The Chantler patent is apparently directed to an equivalent of the Scotch feed in the woolen process or the Derby doubler of the cotton condenser process. In the more pertinent cotton condenser system, for example, a web of waste cotton from the breaker part of the cotton condenser card is commonly subjected to the crushing action of Peralta rollers and then condensed into sliver form by being pulled through a condensing trumpet by calender rolls. The coiled slivers then pass through a machine known as the Derby doubler in the English cotton condenser system. This machine converts the slivers into the form of solidly rolled laps of waste cotton, which are then fed into the finisher part of the cotton condenser card for subsequent cleaning and carding. The final carded web is then divided into ribbons, usually by a single stripper condenser equivalent to the tape condenser of the closely analogous woolen process.

While the Chantler patent is not pertinent to the fine cotton process with which the invention of the patent in suit is concerned, it nevertheless serves to bring out an important distinction between the scope of coverage of method claim 1, on the one hand, and apparatus claims 2 to 5, on the other, of the patent in suit.

Claim 1 is broadly directed to "a method of treating cotton fibres * * *." Since the November, 1948 Marshall article in "The Textile Manufacturer" discloses the fact that "blends containing 100% cotton" are sometimes processed in woolen cards with the associated application of Peralta crush rolls, it is proper to combine the Chantler patent with the Marshall article and to hold that claim 1 of the patent in suit is unpatentable over Chantler in view of Marshall, and the claim is therefore invalid and should be disclaimed. Chantler discloses the thin carded web formation step, the crush roller passage step (Peralta crushing rollers are certainly "adapted to crush small impurities in the web"), and probably the longitudinal drafting step, since the Chantler web is being drawn through a pair of calender rollers after passage through the crush rolls. In the event that the drafting action in Chantler is merely a' tension draft to take up slack without slightly stretching the web, the Court would still be of the opinion that Claim 1 is unpatentable over Chantler in view of the Marshall article, which, of course, discloses the fact that "a method of treating cotton fibres" may be the woolen process, or method. Similarly, Harmel discloses the fact that cotton may be processed on worsted cards, and this is sometimes done in this country in order to prepare combed cotton yarns.

■ Plaintiff similarly contends that the Court should interpret the words "a cotton carding machine" in apparatus claims 2 to 5 to mean "a machine for carding cotton," i. e., to be of equivalent scope to that of the expression "a method of treating cotton fibres" in claim 1. The Court cannot accept this contention for a number of reasons. While it is true that "a machine for carding cotton" could be a worsted card, a woolen card, a cotton condenser card, or a conventional cotton card, "a cotton carding machine" refers only to a particular type of machine, i. e., a conventional single cylinder cotton card used in the fine cotton process, or equivalently, a tandem card used in the same process.

The fact that a worsted or woolen card may occasionally be used to card virgin cotton does not make the machine a cotton carding machine. As a machine, it remains a worsted or woolen card regardless of the fiber being processed on it.

■ Although the Court is of the opinion that it would be unreasonable to interpret the words "a cotton carding machine" to include worsted cards or woolen cards in view of the fact that the specification of the patent in suit contains no mention of the natural fiber wool, the same basic objection is not present with regard to cotton condenser cards, which process cotton waste. However, in view of the unequivocal testimony of plaintiff's witness Professor Bogdan at the trial that "if we have a waste or condenser system we modify the word (cotton) by making that addition with some sort of adjective," plus the fact that neither the word "condenser" nor the word "waste" appears anywhere in the specification or claims of the patent in suit, the Court believes it necessary to hold that the words "a cotton carding machine" in claims 2 to 5 cannot reasonably be interpreted to include "a cotton *condenser* carding machine." Further evidence of the propriety of such a holding is that the conventional cotton card of today is a revolving flat card, while the typical cotton condenser card contains workers and strippers over the top of the carding cylinder, or swift, providing an appearance for the cotton condenser card similar to that of worsted and woolen cards. The specification of the patent in suit contemplates the use of a revolving flat card, according to column 2, lines 18–24. The claims are not, of course, limited to a revolving flat card,

and would still include within their scope any card (even one with workers and strippers) used in the fine cotton processing industry, as distinguished from the cotton waste industry, so long as the other claim elements, especially the crush rolls, are present in the particular cotton card.

## PRIOR USE OF ROLA-SLIVUP DEVICE

In addition to the 34 patents and publications relied upon by plaintiff as prior art to invalidate defendant's patent (of which 34 references the Court views the previously mentioned Harmel and Peralta patents, as well as defendant's prior advertisements, as being the most pertinent, other than those cited by the Patent Office), the plaintiff also relies upon a prior use of a device known as the ROLASLIVUP, which was in use in everyday operation at the Parkdale Mills in Gastonia, North Carolina, at least as early as November 24, 1956. The ROLASLIVUP device is designed to replace the doffer comb or fly comb of a conventional cotton card. In the conventional cotton card the web of fibers, approximately 40 inches wide, is peeled from the doffer by means of the oscillating doffer comb; and the web is then pulled through a condensing trumpet by means of calender rolls rotating at a faster surface speed than that of the doffer. The function of the trumpet is to condense the 40 inch wide web into a sliver which passes to the drawing frame for drafting prior to spinning of the yarn.

█ Plaintiff contends that, in addition to its primary function of peeling the web from the doffer, the ROLASLIVUP device (which is a pair of rolls $\frac{7}{8}$ inch and $1\frac{1}{4}$ inch in diameter placed adjacent to the doffer) also performs at least some crushing of impurities in the cotton web thus removed from the doffer, and therefore the device should be viewed as "a pair of impurity crushing rollers," as recited in claim 2 of the patent in suit. Examination of the drawings for this ROLASLIVUP device, plus review of the trial testimony on it, necessitates a finding by the Court that a person having ordinary skill in the relevant art would not consider the device to be "impurity crushing rollers" as that expression would be understood in textile fiber processing. While the top roller rests against the lower roller and therefore exerts some pressure due to the 10 pound weight of this top roller, this pressure is such that it is not merely different in degree, but different in kind from the crushing pressures (a few hundred pounds) contemplated by the invention of the patent in suit. Although some crushing undoubtedly would (at least in the case of the largest and weakest impurities) be incidentally performed by this ROLASLIVUP device, it cannot realistically be considered to be a prior use that would anticipate the "impurity crushing rollers" element of claim 2 of the patent in suit. Any crushing performed by the ROLASLIVUP is found by the Court as a fact to be insignificant. Certainly no crushing of the relatively "small impurities in the web," as required by claim 3 of the Varga patent, would be performed.

Plaintiff contends that, even if the ROLASLIVUP would not be considered under 35 U.S.C. § 102 to anticipate "the invention" of the patent in suit, it would nevertheless render Varga's inventive concept obvious under 35 U.S.C. § 103. Although plaintiff contends that the wooden blocks and set screws used to maintain the top roller of the ROLASLIVUP in contact with the lower roller are pressure devices and that the pressure may be increased by tightening these screws against the wooden blocks on the end journals of the top roller, the Court is of the opinion that such tightening of the screws would probably merely cause the working part of the rollers to separate due to a bowing of the lightweight (10 pounds) top roller. Thus, tightening of the screws would likely result in less impurities being crushed, rather than more.

█ Plaintiff also contends that it would have been obvious to apply the

teachings of Caspari United States patent No. 2,854,700, issued in 1958, to increase the pressure exerted by the ROLASLIVUP device to a point where it might be justifiably classified as "crushing" pressure. The Court is of the opinion that, in order to properly combine these references, there must be at least some initial indication that the ROLASLIVUP rolls function incidentally as pressure rolls, rather than merely as peeler (or take-off) rolls for peeling the web from the doffer. There having been no previous recognition that the ROLASLIVUP device functioned to any significant extent as a device for crushing impurities, especially "small impurities" as recited in claim 3, the Court holds that this would be an improper combination of references as of the time the Varga invention was made, i. e., November 26, 1957.

The ROLASLIVUP device does serve a useful function as a substitute for, and a mechanical equivalent of, the doffer comb or fly comb; and it is protected by Clark United States patents No. 2,910,-734 and 2,910,735. The facts that these two patents are closely related, one being a continuation-in-part of the other, both being issued by the Patent Office on the same day (November 3, 1959), both being classified in the same class and sub-class, which sub-class (19–106) was the first one searched (according to the file history of the Varga patent) by the Examiner who handled the application which matured into the patent in suit, and one of these two Clark patents (2,-910,734, the parent case) having been cited (as a secondary reference only) by the Examiner during the prosecution of the Varga application in the Patent Office, constitute at least some indication that the Examiner, like the Court, did not consider the ROLASLIVUP device to either anticipate under 35 U.S.C. § 102, or render obvious under 35 U.S.C. § 103 the inventive concept disclosed and claimed in the patent in suit.

In this regard, the Court fully agrees with the statement at page 97 of plaintiff's Brief after Trial that "none of

the references cited by the Patent Office disclosed the use of crush rolls for cotton as in the Harmel patent." Clark patent No. 2,910,734 (actually cited by the Examiner) does not disclose the use of "crush" rolls for cotton, and neither does Clark patent No. 2,910,735, which discloses the equivalent ROLASLIVUP device relied upon by plaintiff as a prior public use of the Varga invention, as stated at page 9 of plaintiff's Trial Brief.

The Court also finds it worthy of note that, when customers of Parkdale Mills inquired as to whether cotton web purifiers such as defendant's CROSROL Model FCP and plaintiff's ROLAKLEEN were being used, Parkdale Mills advised their customers that such cotton web purifiers were not being used. Shortly thereafter, they removed the ROLASLIVUP devices and installed TRASHMASHER devices of the Lummus Cotton Gin Co., the defendant in the Georgia case, supra.

## THE INDEFINITENESS DEFENSE

 In conclusion, with regard to the prior art patents and publications and the prior use of ROLASLIVUP relied upon by plaintiff, the Court finds that none of these singly, or properly combined with others, either anticipates or renders obvious the subject matter disclosed and claimed in apparatus claims 2 to 5 of the Varga patent in suit. Plaintiff has raised a number of other miscellaneous defenses which allegedly invalidate the patent. One of these is that the patent should be held invalid for failure to satisfy the requirements of 35 U.S.C. § 112 because the specification and claims are allegedly vague and indefinite. With the background provided at the trial of this case, the Court has had no difficulty whatsoever understanding the claims of the patent in suit, especially when interpreted, as they should be, in light of the specification. The Court finds that "any person skilled in the art to which it pertains" would likewise have no difficulty understanding the teachings of the patent; and the specification and claims, are therefore held to be

sufficiently clear and concise to satisfy the requirements of 35 U.S.C. § 112.

In view of the fact that plaintiff has particularly stressed two expressions in the specification which allegedly are totally incomprehensible, the Court will endeavor to explain these expressions for plaintiff's benefit. As a starting point, one must always bear in mind the fact that, just as Congress has provided the Courts, the Patent Office, and others with a standard reference person for deciding the issue of obviousness under 35 U.S.C. § 103, i. e., "a person having ordinary skill in the art to which said (claimed) subject matter pertains," so too Congress has provided a standard reference person for deciding the issue of indefiniteness under 35 U.S.C. § 112, i. e., "any person skilled in the art to which it (the invention) pertains, or with which it (the invention) is most nearly connected."

■ The next step is to determine the particular "art" to which the invention pertains. Plaintiff contends that Varga should have included in the specification exact details as to the nature of the "impurity crushing rollers," e. g. sizes, materials, operating pressures, etc. If the invention were directed to mechanical features of the crush rolls per se, there would be some merit in this contention, and the specification would then have to be directed to a mechanical engineer. In fact, Varga has written just such a specification for his prior inventive concept of crossing or skewing the axes of crush rolls, which concept is protected by patent No. 2,762,295. A reference to the British counterpart (patent No. 697,106) is included in the patent in suit.

But the present Varga invention of patent No. 3,003,195 is not directed to any mechanical features of crush rolls per se. The present invention is directed to the broad concept of applying the crushing principle to the fine cotton process by placing "a pair of impurity crushing rolls" and auxiliary "drive means" at the end of "a cotton carding machine" between the "doffer" and

"calender rollers" thereof. With special regard to the second sentence of 35 U.S.C. § 112 and claim 2 of the patent in suit, if this is not in fact "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," the Court is unable to see how it could ever be done to plaintiff's satisfaction.

Since the pertinent art is determined to be the fine cotton processing art, rather than the textile machinery art as such (which would be the pertinent art for Varga patent No. 2,762,295), it is not necessary to include disclosures in the patent which would only tell cotton mill workers in general, and conventional cotton card operators in particular, the following three key facts of which they are already aware. First key fact: The rope-like sliver of cotton fibers can be pulled, or stretched, to a vastly greater extent than that to which the thin, fragile gossamer-like web can be stretched. Second key fact: while the fibers in the sliver are predominantly parallel to each other and to the direction of travel of the fibers as a whole, the fibers in the web are in complete confusion, i. e., arranged in higgledy-piggledy fashion within the web. Third key fact: the webs and slivers as a whole are moving in the longitudinal or machine direction, and therefore each and every individual fiber within the webs and slivers is also moving forward in the longitudinal direction of travel, during processing in the cotton mill. The Court is of the opinion that, if a cotton mill worker did not discover these three key facts soon after accepting a job at the mill, he would be well advised to seek his fortune in another industry.

Assuming now that the cotton mill worker knows these key facts, inventor Varga instructs the card operator who has inserted the new crush rolls between the doffer and calender rolls of the card to rotate "said calender rollers at a sufficiently greater surface speed than said crushing rollers to cause relative longitudinal fiber movement in said web between said crushing and calender rollers." In this regard, method claim 1

simply states that the operator should subject "said web on leaving said crush-ing rollers to a longitudinal drafting ac-tion." The card operator is already well aware of the fact that he must not stretch the fragile web too much because it would break. He would have no ap-preciable difficulty in applying the right amount of machine direction stretch, i. e., "longitudinal drafting action." His do-ing so would cause the fibers within the web to move relative to one another in the longitudinal direction of stretch, thereby producing "relative longitudinal fiber movement," regardless of the con-fused, higgledy-piggledy arrangement of fibers within the web. Furthermore, as set forth in "Cotton Spinning" by Tag-gart, London, 1924 (plaintiff's exhibit 11, tab 19), the fibers within the web will in fact become predominantly parallel as they near the small orifice of the condens-ing trumpet, so that there is little or no difference between the web and the fully condensed sliver at this point.

Another statement in the patent speci-fication which has allegedly confused plaintiff is " * * * the action of mov-ing the fibres relative to one another, as occurs in drafting * * * " Taking this statement out of context, the Court agrees with plaintiff that one cannot know whether the reference is to "draft-ing" the sliver or "drafting" the web. But when the expression is read in con-text, as it properly should be, there is no difficulty in understanding that the ante-cedent of "drafting" is found in the words "drafting of the ironed web" at the beginning of the *same* sentence. (Col. 1, lines 40–45 of patent No. 3,003,-195). It is likewise evident that "draft-ing" in the parenthesis at the end of this sentence refers to drafting of the sliver, which is a process "subsequent" to "drafting of the ironed web."

In conclusion, the Court finds as facts that the specification and claims of the Varga patent in suit satisfy the full re-quirements of 35 U.S.C. § 112 in every material respect. As a general observa-tion, the Court takes the position that, since an Examiner will usually make a

breadth and indefiniteness rejection un-der 35 U.S.C. § 112 if he can fairly and reasonably do so, therefore the issuance of a patent gives rise to a nearly conclu-sive (although still rebuttable) pre-sumption that the patent specification and claims meet the full statutory re-quirements of 35 U.S.C. § 112.

## THE MISREPRESENTA-TION DEFENSE

The Court, upon examination of the file history of the patent in suit, finds that no misrepresentations were made by Varga to the Patent Office during the prosecution of the application which re-sulted in the patent in suit.

 A charge of misrepresenta-tions to the Patent Office by an applicant for a patent is a serious allegation, and should be investigated by a Court even where, as here, the accused infringer does not press the charge initially made. If it is established convincingly that a patentee made a deliberate, intentional misrepresentation to the Patent Office during prosecution of his application, then his patent may be declared invalid on that ground alone, even though the patent might otherwise be valid in every respect. In some extreme cases even an inadvertent misrepresentation due to negligence may invalidate a patent. As a general proposition, however, the Court is of the opinion that innocent and inad-vertent misrepresentations, as distin-guished from intentional, deliberate mis-representations, should not invalidate an otherwise valid patent.

The Court notes that little mention of the misrepresentation defense is made in plaintiff's Brief After Trial, in contrast to the vigorous assertion at page 34 of plaintiff's Trial Brief that "the claims are invalid and unenforceable because of the misrepresentations made by the pat-entee to the Patent Office to obtain the patent." It is possible that this change of position may be due to the fact that plaintiff's Exhibit 54 is a double mis-representation of both the drawings and complete specification disclosures of the Harmel patent. Exhibit 54 is a photo-

copy of the sheet of drawings from a soft copy of Harmel, to figure 1 of which has been added a pair of crush rolls between the second doffer and the calender rolls at the end of the worsted card. The added rolls are sized, cross-hatched, and lettered so as to correspond to the crush rolls actually shown in the Harmel patent drawings between the two carding engines. As introduced in evidence at the trial, there was nothing on the face of this exhibit to give notice that it is anything other than what it purports on its face to be, namely an exact photocopy of the sheet of drawings from a soft copy of the Harmel patent, the principal prior art reference relied upon by plaintiff. Anyone seeing this exhibit for the first time (including, for example, an appellate court) would naturally assume that it is merely a photocopy of the Harmel patent drawings. The major objection to Exhibit 54, however, lies in the fact that the Harmel specification disclosures, taken as a whole, expressly preclude any insertion of crush rolls between the last doffer and the calender rolls at the *end* of a worsted card, i. e., at a position where there is no subsequent carding operation. See Harmel U. S. Patent No. 318,730 at column 1, lines 20–31, esp. lines 26–31 (" * * * *finally, completing* the operation of carding the fibers * * *, *during* which carding operation the crushed or pulverized particles in the fiber are separated and fall out."); column 2, lines 85–90; column 3, lines 43–48 (" * * * the *subsequent* carding operation") ; and column 4, lines 94–99.

While it is undeniably true that the statement at column 4, lines 67 to 72, of Harmel to the effect that " * * * several sets of crushing rolls may be employed * * * at different points in the machine so as to act upon the fiber in successive stages of the carding operation" does not in itself preclude placing crush rolls at the very end of the worsted card so that there is no subsequent carding operation, it is equally true that the statement, when taken completely out of context, does not preclude

placing crush rolls on top of the carding cylinders along with the workers and strippers (cleaners). Since plaintiff's Exhibit 54 is fairly based on a statement in Harmel taken out of context, the Court views the exhibit as a completely innocent misrepresentation, due to the peculiar circumstances of this case. This does not alter the fact that Exhibit 54 is still a double misrepresentation of both the drawings and complete specification disclosures of the Harmel patent.

■ Plaintiff also contends that the patent should be held invalid because of the addition of alleged new matter not supported by a supplemental oath of applicant Varga. Since the Patent Office did not consider the additions made by amendment to be new matter beyond the scope of the originally disclosed inventive concept, therefore the Court does not consider this to be such new matter as would have required filing of a supplemental oath.

■ In reviewing the file history of the prosecution of Varga's patent application in the Patent Office, the Court is impressed by the thorough prosecution which this application underwent, prior to its maturing into a patent. During the prosecution, there were four separate office actions, seven amendments, and at least two interviews with the Examiner which were personally attended by applicant Varga and his patent attorney. An application which has undergone such a thorough prosecution was not lightly granted by the Patent Office, and the resulting patent should not lightly be held invalid by the Courts.

## INFRINGEMENT BY ROLA-KLEEN DEVICE

■ With regard to the issues of infringement, the accused ROLAKLEEN device manufactured and sold by plaintiff for installation between the "doffer" and the "calender rollers" of an existing conventional "cotton carding machine" amounts, in essence, to a combination of plaintiff's previous ROLASLIVUP device with the crushing roll inventive concept of the patent in suit. A small 1 in.

peeler roll acting in concert with a large 4 in. roll is used to peel the "carded web in substantially full width from the doffer." The Court finds that this part of the accused ROLAKLEEN device is the mere mechanical equivalent of the prior art ROLASLIVUP device, and likewise the mechanical equivalent of the doffer comb used on conventional cotton cards. No resort to the doctrine of equivalents is necessary anyway, since the claims of the patent in suit do not recite a doffer comb element.

While the disclosure of the patent in suit contemplates a web passing through the air between the doffer and the crushing rolls such that the crushing rolls must be rotated at a "sufficient" surface speed (which may be greater or less than that of the doffer) to take up slack in the web thus suspended in mid-air, this embodiment does not represent a material part of the inventive concept, and is not recited in the claims of the patent in suit.

In the ROLAKLEEN device the web passes from the nip of the 1 in. and 4 in. rolls which, taken together, function as a pair of peeler (or take-off) rolls, to the nip of the crush rolls themselves. In this ROLAKLEEN device, a third 3 in. roll is maintained in contact with the previously mentioned 4 in. roll by a "load means pressing said (3 in. and 4 in.) ironing rollers together with sufficient force to crush small impurities in said web," which load means causes the 3 in. roll to exert a crushing pressure (about 450 pounds) on small impurities in the carded web passing through the nip of the 3 in. and 4 in. crushing rolls, which, taken together, function as "a pair of impurity crushing rollers" or "smoothly ground ironing rollers." Since the web on the ROLAKLEEN device passes from the nip of the 1 in. and 4 in. peeler rolls to the nip of the 3 in. and 4 in. crushing rolls atop the surface of the bottom 4 in. roll, this serves "to take up slack in the web between the doffer and the crushing rollers" (or "said ironing rollers"). The weight of a web causes it to sag in the middle, and any surface (such as the curved surface of the 4 in. roll) which supports the weight of the web will "take up slack in the web" due to that weight.

The ROLAKLEEN crush rolls which are used subsequent to final carding in the fine cotton process constitute the essence, and the most "material part" of the invention claimed in the patent in suit. 35 U.S.C. § 271(c).

The ROLAKLEEN crush rolls differ from defendant's CROSROLS in that the "load means" is located at the center of the top 3 in. roll of the ROLAKLEEN device, which location serves to maintain an even crushing pressure along the full length of the crushing rolls, while defendant's CROSROLS utilize the patented (Varga U. S. patent No. 2,762,295) principle of crossing or skewing the axes of the crush rolls, so that a helical line of contact is maintained. Nevertheless, the claims of the patent in suit are not limited to defendant's CROSROL device.

The Court finds the inventive concept disclosed and claimed in the patent in suit to be sufficiently broad to cover any type of web crush rolls placed at a location *subsequent to final carding* in the fine cotton process, as long as the web crush rolls may truly be classified as "impurity *crushing* rollers" (i. e., not merely peeler rolls, take-off rolls, calender rolls or drafting rolls, which exert a limited amount of pressure, but no significant amount of "crushing" pressure).

When the ROLAKLEEN device is used, the web containing the crushed impurities is pulled from the nip of the 3 in. and 4 in. crush rolls through a condensing trumpet (which condenses the web into a rope-like sliver) by a set of calender rolls. These calender rolls of the cotton carding machine invariably rotate at a surface speed in excess of the surface speed of the ROLAKLEEN crush rolls, in order to be operable in practice.

### THE FILE WRAPPER ESTOPPEL DEFENSE

With regard to the excess surface speeds at which the calender rolls rotate relative to the surface speeds of the crushing rolls, plaintiff contends that defendant's claims were amended during

prosecution of the application in the Patent Office to exclude "tension draft", which in conventional cotton cards has allegedly represented excess surface speeds of the calender rolls over the doffer in the range from 1.8 to 29% to "take up slack in the web." Since the excess surface speeds of the calender rolls over the ROLAKLEEN rolls (all three of which rotate at the same surface speeds) range from 7.1 to 17.3%, plaintiff contends that defendant should be held to be estopped by the file wrapper of the patent in suit to assert that the claims read on the ROLAKLEEN device, as it is actually operated in cotton carding machines.

■■■ The doctrine of file wrapper estoppel is basically an equitable one, when properly understood and applied. When an applicant faced with a prior art rejection pursuant to 35 U.S.C. §§ 102 or 103 limits his claims in order to overcome the prior art rejection, it is inequitable for him to later assert that his patent coverage is of the same scope as it potentially was prior to amending his application claims in the Patent Office. If he had not inserted certain limitations in his claims, it is presumed that the claimed subject matter would have been anticipated by, or obvious in view of, the cited prior art references.

The same considerations do not apply to rejections other than prior art rejections, e. g. a rejection for undue breadth of claims. Whatever is unduly broad to one Examiner may be quite satisfactory to another. When a rejection of this type is made by an Examiner, and the applicant strongly disagrees, whether or not the limitations desired by the Examiner will be inserted in the claims often depends on the inventor's financial backing. A wealthy inventor can fight the breadth rejection by appealing to the Board of Appeals and, if need be, to either of two Courts in Washington. Even further appellate Court review is possible. The indigent inventor, on the other hand, is often forced to insert any limitations into his claims dictated by the whim and fancy of a particular Examiner, since he cannot afford the fees required by prolonged legal services of a skilled patent attorney. Thus, the doctrine of file wrapper estoppel often proves to be an inequitable one, when it is improperly applied to preclude resort to the doctrine of equivalents by a patentee who was forced to insert limitations into his claims in response to a Patent Office rejection not based on prior art.

Upon review of the file history of the patent in suit, the Court agrees with plaintiff that the doctrine of file wrapper estoppel is applicable here, since Varga limited the scope of his claims in response to a prior art rejection to exclude "tension draft," or merely taking up slack without stretching the web, between the crushing and calender rolls. Varga even stressed the distinction to be made between mere tension draft and "longitudinal drafting" of the web by amending the claims to specify that the crushing rollers are to rotate "at a speed sufficient to take up slack in the web between the doffer and the crushing rollers," while the calender rollers, on the other hand, are to rotate "at a sufficiently greater surface speed than said crushing rollers to cause relative longitudinal fiber movement in said web between said crushing and calender rollers."

With regard to taking up slack in the web, one must remember that "taking up slack" is a broader term than "drafting," or stretching, a web or a sliver of fibers. It is necessary to take up a certain limited amount of slack before there can be any stretching that would produce "relative longitudinal fiber movement". However, when a web or sliver is being "drafted," it is undeniably true that some slack has been taken up. Therefore, although it is possible to "take up slack" without having any "longitudinal drafting action," it is impossible to have such "drafting" of the web without "taking up slack" in the web.

Since it has been established as a fact that it is possible "to take up slack in the web between the doffer and the

crushing rollers" by using "drive means" to rotate the crush rolls at surface speeds either greater or less than those of the doffer, therefore any operable relative surface speeds of crush rolls and doffer "sufficient to take up slack in the web" are covered by the claims of the patent in suit, and plaintiff cannot avoid infringement by the mere fact that the ROLAKLEEN rolls are sometimes rotated at slower surface speeds than those of the doffer. Likewise, the fact that the web might be "drafted" or stretched slightly between the doffer and the 3 in. and 4 in. ROLAKLEEN crush rolls would not avoid infringement, since this also involves "taking up slack in the web."

With regard to the "longitudinal drafting action" between the crushing and calender rollers, and plaintiff's contention that "tension drafts" of 1.8 to 29% are excluded due to the doctrine of file wrapper estoppel, it is difficult to believe that a 29% draft would only take up slack in a web without producing any slight stretching, or "drafting" of the web. It appears to the Court that the prior art has included some loose usage of the term "tension draft." The lower limit, i. e. 2%, appears to be a more strictly correct usage of the term as applied to webs between the doffer and calender rollers. See Willis and Moore, "Cotton Carding," 1936, pp. 17 and 29 (plaintiff's exhibit 11, tab 15).

Even assuming that it is proper to consider drafts of 1.8 to 29% as "tension drafts," then one must remember this applies to the draft between the single doffing cylinder (doffer) and the first succeeding set of rolls, which would be the calender rolls in a conventional cotton card, but would be the crush rolls in a carding machine modified by installation of crush rolls between the doffer and calender rolls. Furthermore, it is considered improper from a technical standpoint to compare (1) drafts between a single cylinder (the doffer) and a pair of rolls with (2) drafts between two pairs of rolls, such as the crushing and calender rollers.

The book of prior art relied upon by plaintiff (tabs 21 and 31, exhibit 11) indicates that "tension draft" between two successive pairs of rolls is no more than a 5% draft, usually less than 5%. See Merrill, "Cotton Drawing and Roving", 1941, p. 9, "Tension Draft of 1.03," or 3%. "It is usually less than 1.05", or 5%. Also see "Revolving Flat Card, Technical Information," Whitin Machine Works, 1950 (5% "tension draft" between calender rolls and coiler calender rolls).

While it is true that the 12.5% draft between the ROLASLIVUP rolls and the calender rolls is not a tension draft, it is also a fact that the last element of claim 2 of the patent in suit ("drive means rotating said calender rollers at a sufficiently greater surface speed than said crushing rollers to cause relative longitudinal fiber movement in said web between said crushing and calender rollers") would not have been anticipated by the Clark patent on the ROLASLIVUP device, since "the rollers which receive the carded web in Clark are not crushing rollers * * *," as stated by Varga in his amendment of March 24, 1961.

Thus the Court finds that, while defendant is estopped by the file wrapper to assert that the claims of the patent in suit cover tension drafts of 5% or less between the pairs of "crushing and calender rollers," plaintiff cannot avoid infringement due to this estoppel because the minimum draft between the ROLAKLEEN rolls and the calender rolls is 7.1%, which is not a "tension draft" between successive pairs of rolls.

In all four constructions of the accused ROLAKLEEN device, the calender rolls are rotated at "a sufficiently greater surface speed than said crushing rollers to cause relative longitudinal fiber movement in said web between said crushing and calender rollers," such excess speeds ranging from 7.1% to 17.3%. Of course, there is an optimum range for this excess surface speed of the calender rolls over that of the crush rolls. If the excess is too slight, then the web containing the

crushed impurities will stick to the surface of one of the crushing rolls due to either static electricity or to adherence of the web to oily liquids on the surfaces of the crush rolls. Thus, a certain minimum excess must be maintained for practical operation. On the other hand, too much excess speed would stretch the fragile web so much that it would break, which is obviously undesirable.

The Court finds that the 7.1 to 17.3% excess surface speeds at which the calender rolls are rotated relative to the ROLAKLEEN rolls are included within the claims of the patent in suit. As recited in claims 2 and 3 of this patent, the ROLAKLEEN device also includes "drive means" so that the calender rolls are rotated at excess surface speeds over those of the crushing rolls, and further "drive means" to rotate the crush rolls at optimum surface speeds relative to the surface speeds of the doffer.

Upon review of all the evidence introduced at the trial of this case on the issue of infringement, the Court finds that all four constructions of plaintiff's accused ROLAKLEEN device infringe claims 2 and 3 of the patent in suit. Defendant placed final reliance only upon apparatus claims 2 and 3 in its counterclaim for infringement. The Court finds that the ROLAKLEEN device would not infringe claim 4 anyway, since that claim requires "a plurality (at least 2) of secondary ironing rollers * * * contacting the periphery of said main ironing roller." While the 4 in. roll could be a main roller, and the 3 in. roll a secondary roller, the 1 in. roll would not meet the terms of claim 4 since there is no "load means" pressing it "with sufficient force to crush small impurities in the web." Since, however, the claimed combination of claims 2 and 3 also includes the doffer and calender rolls of the conventional cotton card, and since plaintiff does not manufacture or sell either doffers or calender rolls, the direct infringements of claims 2 and 3 occur on the part of plaintiff's customers, to whom plaintiff sells the ROLAKLEEN device for use on already existing cotton cards. While plaintiff's customers are technically the direct infringers of claims 2 and 3, the Court holds that plaintiff contributorily infringes these two claims by selling to its customers the accused ROLAKLEEN device which embodies the most material part of the claimed invention of the patent in suit.

The Court finds that the accused ROLAKLEEN device is not a staple article or commodity of commerce suitable for any known substantial non-infringing use, and that plaintiff actively induces its customers to infringe defendant's patent by selling the ROLAKLEEN device to them with the instructions that they locate it at the end of the conventional cotton card between the doffer and the calender rolls thereof. Plaintiff especially actively induces infringement of defendant's patent when it actually installs the ROLAKLEEN apparatus on its customers' cotton cards, by means of plaintiff's own employees or by means of the customers' employees acting under supervision by plaintiff's employees.

THE PATENT MISUSE DEFENSE

■ As a further defense, plaintiff alleges that defendant misused the patent in suit by using it to obtain a monopoly on unpatented goods, namely, the "impurity crushing rollers" or "smoothly ground ironing rollers" of claims 2 and 3 of the patent in suit.

The Court holds that the equitable defense of patent misuse will not suffice, on the record in this case, to render defendant's patent unenforceable. In the first place, defendant's CROSROL model F.C.P. web purifiers are not really unpatented goods at all, the broad structural concept of crossing or skewing the axes of crush rolls disclosed and claimed in Varga's prior U. S. Patent No. 2,762,-295 being sufficient to protect defendant's new F.C.P. (fine cotton purifier) CROSROLS, as well as the W.P. and C.W.P. CROSROLS which were contemplated at the time of filing the application for Varga patent No. 2,762,295.

More importantly, the burden on plaintiff to prove patent misuse by the defend-

ant has not been met. Plaintiff introduced no evidence at the trial which might establish that plaintiff attempted to obtain a license under defendant's patent in suit in order to make, sell, and install the ROLAKLEEN device on existing conventional cotton cards. Plaintiff has likewise failed to prove that any cotton mill in this country actively sought, and was refused, a license under defendant's patent in suit to practice the Varga invention (of applying the crushing principle to the fine cotton process) with the use of crush rolls other than defendant's CROSROLS, such as, for example, plaintiff's ROLAKLEEN device or the TRASHMASHER device of the Lummus Cotton Gin Company.

Plaintiff has established a fact which defendant was willing to admit anyway, namely, that defendant has offered no express licenses to cotton mills to merely use the invention of the patent in suit, but this would be perfectly in accord with a finding of fact that defendant never denied an express license to use the invention to any cotton mill which actually sought such an express license. Any mill which purchases its cotton web purifiers only from defendant would, of course, have an implied license to use such F.C.P. CROSROLS in the practice of the Varga invention of the patent in suit.

■ Even assuming for plaintiff's benefit that denial of such a license would constitute patent misuse, which assumption is very much open to question, plaintiff has not proved that defendant denied either it or the Lummus Cotton Gin Company licenses to sell their respective ROLAKLEEN and TRASHMASHER devices to cotton mills. Grant of such licenses does not constitute patent misuse, since this conduct is expressly permitted under 35 U.S.C. § 271(d) (2). In fact, defendant has granted just such a license to its American affiliate, Crosrol Carding Developments, Inc., to sell in this country the F.C.P. CROSROLS made in England by defendant's British affiliate, Carding Specialists Co. Ltd. As further evidence of the fact that defend-

ant is not pursuing a restrictive licensing policy, defendant has granted licenses under the patent in suit to manufacturers of new cotton carding machines.

■ Finally, defendant's counterclaim for contributory infringement in this case does not constitute patent misuse, since such action is expressly permitted under 35 U.S.C. § 271(d) (3).

### HISTORY OF THE ART TEST

■ In view of the fact that patent misuse is an equitable defense, it is appropriate to consider where the equities really lie in the present case. At least some of the various factors considered in the positive history-of-the-art test for determining obviousness or unobviousness of an invention under 35 U.S.C. § 103 may also be viewed as equitable considerations in some cases, such as this one. As previously mentioned, Harmel burr crushers have been available in the worsted system since 1885, and Peralta crush rolls have been available for the woolen and cotton condenser systems since 1937, yet no one had taken steps toward the practical application of either these devices, or the crushing principle in general, to the fine cotton system prior to the Varga invention in 1957, which is disclosed and claimed in the patent in suit. See Reiner v. I. Leon and Co., 285 F.2d 501, 504 (2nd Cir. 1960).

Plaintiff contends that there was no long felt need to apply the crushing principle to the fine cotton system, due to the fact that mechanical harvesting (as distinguished from hand-picking) of cotton did not come into widespread use until the late 1950's, i. e., about the time that the Varga invention was made. While it may be, and probably is, true that cotton picked by hand prior to World War II was appreciably cleaner than the cotton harvested since the War due to the painstaking care with which cotton was formerly picked, nevertheless defendant's witness Burley of the Department of Agriculture testified that the hand-picked cotton of recent years is often so trashy that it is virtually indistinguishable from mechanically harvest-

ed cotton, in that both contain relatively large amounts of impurities such as seeds, stalks, stems, and leaves. Furthermore, there is ample evidence in this case to justify a finding that, for a number of years, means have been sought to obtain further purification of cotton in cotton mills so that, for example, either the same quality yarn may be obtained from a relatively cheaper, trashier lint cotton raw material,[2] or so that a better quality, more valuable yarn may be obtained from the same grade of lint cotton raw material. Thus, even if it were a fact that hand-picked cotton prior to World War II contained appreciably less trash than the hand-picked and mechanically harvested cotton of today, the Court finds that even then it would have been highly desirable for fine cotton processing mills to have applied this crushing principle of the Varga invention in order to effect significant further trash removal in the cotton mills, such further trash removal leading naturally to either better quality, and therefore more valuable, cotton yarn produced from the same grade lint cotton, or alternatively, leading to production of equivalent quality yarns from a trashier, lower grade, and therefore less expensive raw material lint cotton.

A further important factor to be considered in the history-of-the-art test for determining obviousness is the widespread acceptance of the Varga invention by fine cotton processing mills in both Great Britain and the United States.

At the trial of this case, defendant's witnesses Marshall and Lowry testified to the widespread acceptance of the Varga invention by the Lancashire cotton mills in England and by Deering Milliken in this Country. In fact, Deering Milliken equipped 1100 of its 1500 cotton cards with the apparatus and recovered

its investment of one million dollars in one year, through savings in raw material costs alone. Furthermore upon review of the evidence in the present case, as well as Judge Elliott's opinion in the Georgia case (see 142 USPQ at 455), the Court is thoroughly convinced that both plaintiff Abington and the Lummus Cotton Gin Co. obtained the basic ideas for their respective ROLAKLEEN and TRASHMASHER devices from the inventive concept of inventor Varga, which was apparently first made available to the public when defendant's CROSROL Model F.C.P. machine was publicly displayed at the International Textile Machinery Exhibition at Manchester, England, in October 1958; plaintiff's General Manager saw defendant's machine there and was evidently impressed by the device.

At an earlier time when more cordial relations existed between the parties to this suit, it was proposed that Clark, the inventor of plaintiff's ROLASLIVUP device, which replaced the doffer comb of conventional cotton cards, might work jointly with Varga to design a new device for cotton carding machines combining the best features of the ROLASLIVUP peeler rolls and Varga's impurity crushing rollers. When plans for such cooperation failed to materialize, Clark went ahead and designed the combination device by himself, which, of course, he was free to do. That combination device is plaintiff's ROLAKLEEN.

Although the Court is not aware that a patent has been granted for the ROLAKLEEN device, it should be patentable as an improvement invention. One of the many attractive features of the device is its compactness, which eliminates any necessity of extending the distance between the doffer and calender rollers in order to install crushing rolls on exist-

---

2. Bales of lint cotton coming to the cotton mill from cotton gins are classified according to grades such as middling, low middling and strict low middling. One of the most important factors in determining the grade of lint cotton is its content of trashy foreign matter. Likewise, yarns are graded A–D by standards of the American Society for Testing Materials (ASTM), according to the number of thick and thin places, amount of trash and neps which detract from the appearance of the yarn.

ing cotton carding machines. In the crowded carding rooms of some cotton mills, no additional space is available.

Even if such an improvement patent were granted for the ROLAKLEEN device, however, that patent would be dominated by the Varga patent in suit on the prior pioneering invention during the term of the Varga patent. Thus plaintiff would not be able to sell or install its patented ROLAKLEEN device between the doffer and calender rolls at the end of conventional cotton cards until October 10, 1978, unless a license under the Varga patent permitting such sales and installations was first obtained.

The Court is of the opinion that, in view of the lapse of 72 years between the Harmel burr crusher patent of 1885 and the Varga invention in 1957, and further, the lapse of 20 years between the Albero patent of 1937 for Peralta crush rolls and the Varga invention in 1957, it is unlikely that a further passage of merely eight years between 1957 and 1965 would have made any appreciable difference; and it is therefore likely that the American public in general, and the fine cotton processing industry in this Country in particular, would not have the benefit of this valuable invention today, if it had not been for the research and discovery of Mr. Varga.

In view of Varga's significant contribution to the advance of the useful art of fine cotton processing in cotton mills, the Court considers it only fair and just that defendant, assignee of the Varga patent in suit, should reap the rewards due to this invention during the term of the patent.

In this regard, the Court takes note of plaintiff's contention that sustaining the validity of the patent in suit would enable defendant "to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438. If it is true that the Varga invention does not represent any advance in the fine cotton processing art, then cotton mills should be able to survive until 1978 without it, as they did for many years prior to the invention. Also, in those cotton mills which utilize tandem cards, crush rolls could be installed between the first doffer and the second cylinder, since the claims of the patent in suit (except method claim 1, which the Court holds to be invalid, as Judge Elliott also did in the Georgia case) only read on the application of the crushing principle subsequent to final carding in the fine cotton process. This is the essence of the Varga invention, since slight drafting of the web is an operational necessity in practice anyway. Lastly, defendant cannot "lay a heavy tax upon the industry of the country" since any attempt to price the CROSROL Model F.C.P. Cotton Web Purifier out of competitive range in the market will merely result in loss of sales to the Lummus Cotton Gin Co., which can freely sell and install its TRASHMASHER device as a result of the decision in the Georgia case.

## PRESUMPTION OF VALIDITY

■■ Plaintiff contends that the presumption of validity of claims 1 to 4 of the patent in suit has been weakened by the fact that the most pertinent prior art was not cited by the Patent Office, and that the presumption was weakened or destroyed as to claims 1 to 3 by the decision in the Georgia case. The Court agrees with plaintiff that the statutory presumption has been weakened, but the patent is still presumptively valid under 35 U.S.C. § 282, and the statutory burden of establishing invalidity rests upon plaintiff, which has failed to meet that burden on the evidence in this case. A patentee never bears the burden of proving his issued patent to be valid, even if his patent has previously been declared invalid in personam in suits against third parties.

In seeking to meet its burden of proof, plaintiff has cited cases holding that new combinations of old mechanical elements, or new and completely analogous uses of old machines represent a lack of invention, in the absence of any new and un-

expected result. These negative rules of invention were developed by the Courts in a series of decisions involving the judicial "lack of invention" or "want of invention" test. The requirement of "invention" was first set forth by the Supreme Court in Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683 (1850). In 1952, however, Congress enacted a statutory standard of "invention" for the first time; that standard is the obviousness test of 35 U.S.C. § 103, which is the correct legal test that must be applied today.

The fact that many Courts, including this one, often continue to speak in terms of the "lack of invention" or "want of invention" test is merely evidence of the well-known force of judicial habit, plus the fact that in the majority of cases the outcome on the particular issue will be the same, regardless of whether the lack of invention test or the obviousness test is applied. The fact that the obviousness test is regarded by many as being more objective than the lack of invention test is evident from the Reviser's Note for 35 U.S.C.A. § 103, which states in part that "[t]his paragraph is added with the view that an explicit statement in the statute may have some stabilizing effect * * *."

 To the extent that application of the correct legal standard to the facts might change the outcome in a close case, it will not suffice for an accused infringer to prove that, according to the negative rules of (what is not) "invention," there is a "lack of invention" or "want of invention" in the patentee's claimed subject matter. In order to meet his statutory burden of proof under 35 U.S.C. § 282, the accused infringer must prove, by a preponderance of the evidence, that "the differences between the subject matter * * * patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The Court can-

not agree with plaintiff that it has met its statutory burden of proof in this case.

Even applying the old negative rules of (what is not) "invention" for plaintiff's benefit, the new use in the fine cotton process of crush rolls, which are old per se, is not a completely analogous use. In fact, if anything, it is a completely nonanalogous use. The distilled essence of the prior art uses of crush rolls, on the whole, is that the rolls must be located at a position both subsequent to prior carding and prior to subsequent carding. Prior carding was necessary in order to properly prepare the thin carded web for application of the crushing principle; and subsequent carding was considered necessary, as a practical matter, in order to remove the crushed impurities from the fibers. Varga's use of crush rolls subsequent to final carding in the fine cotton process was particularly nonanalogous when compared to the cotton condenser process. The woolen and worsted systems are almost always used for processing wool fibers, although cotton may also be, and occasionally is, processed on these systems.

As for the negative rule of (what is not) "invention" that a new combination of old mechanical elements is not invention, in the absence of any new and unexpected result, the Court is of the opinion that new and unexpected results are in fact obtained by the practice of the Varga invention. For example, the resulting cotton yarn is free from neps, and a large reduction in yarn breakage during spinning is realized. Some of the beneficial results are produced due to the fact that the crushing rollers are also ironing rollers which iron the individual fibers in the cotton web so that they will slip past each other more readily in subsequent processing. Furthermore, an examination of plaintiff's advertisement for the "revolutionary" ROLA-KLEEN combination device (defendant's exhibit 63, tab 3) indicates that plaintiff itself may have discovered one or two new and unexpected results due to practice of the Varga invention.

## PERIOD OF RECOVERABLE DAMAGES

Both parties agree that, if the patent in suit is held valid and contributorily infringed, and the Court so holds, then damages are recoverable since June 11, 1962, the date of the first formal notice of infringement given plaintiff by defendant subsequent to issuance of the patent in suit. Defendant contends that damages are also recoverable for the eight-month period between the date of grant of the patent, October 10, 1961, and the date of the aforesaid notice of infringement. Plaintiff opposes this contention on three major grounds, but the Court agrees with defendant's position on the issue. The three grounds relied upon by plaintiff are that (1) defendant's counsel waived the right to recover damages for the earlier period by a statement made at the trial; (2) the notice of June 11, 1962 was the first notice of infringement; and (3) defendant's CROSROL Model F.C.P. Cotton Web Purifiers were not marked with the number of the patent in suit prior to June 11, 1962.

■ While the Court could interpret the statement of defendant's counsel at trial that "we are seeking recovery for infringements occurring after June 11, 1962," as a waiver of the right to recover for infringements occurring prior to that date, the Court is disinclined to do so because of the fact that the statement was spontaneously made in response to an immediately preceding statement of plaintiff's counsel which asserted the second and third grounds mentioned above.

■ The second ground, that the June 11, 1962 notice was the first notice of infringement given plaintiff by defendant is true, insofar as formal notices of infringement written after the issuance of a patent are concerned. But that notice was not the first notice of infringement of the patent in suit in a real sense. Plaintiff's Treasurer and General Manager Smith testified at the trial that he learned late in September 1961 that there was an allowed patent application on the Varga invention. He learned this from a personal letter of Varga to him dated September 19, 1961. The Varga application was allowed by the Patent Office on August 1, 1961, and the final fee had been paid August 17, 1961, so that formal grant of the patent by the Patent Office was truly imminent late in September of 1961. Plaintiff's General Manager also testified that he personally saw a copy of the Varga patent in suit "shortly after October 10th, 1961, when it was issued by the Patent Office." Thus, plaintiff must be considered to have had not only constructive notice but also actual notice of the existence of the patent in suit as of its issue date.

■ The mechanical simplicity of the Varga invention is evident from claim 2, which recites five elements of a modified cotton carding machine: a doffer, a pair of calender rollers, a pair of impurity crushing rollers, and two sets of drive means. In view of such simplicity, plaintiff must be considered to have known, at the time the patent in suit was issued, that any cotton mill which modified a cotton card by inserting between the doffer and calender rollers (which are standard elements of any cotton card) thereof a pair of impurity crushing rollers, together with two sets of drive means (one to rotate the crushing rollers so as to take up any slack which might be present in the web between the doffer and crushing rollers, the other to rotate the calender rollers at a faster surface speed than the crushing rollers, thereby slightly drafting the ironed web between these two pairs of rollers) would directly infringe the Varga patent in suit, if the patent were valid. Of course, any cotton mill which elected to do so could assume the risk that the patent might be held valid and construct the infringing combination anyway, but that would be an exceedingly dangerous way of doing business. The Varga patent in suit was presumptively valid by 35 U.S.C. § 282 and enforceable against everyone until August 27, 1964, the date of the decision in the Georgia

case. Thus the Court holds that plaintiff had actual knowledge as of October 10, 1961 that the combination (cotton carding machine) disclosed and claimed in the patent in suit was both patented and infringing. Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed. 2d 457 (1964). To complete the picture as to notice or knowledge, plaintiff sells as part of the ROLAKLEEN package not only the rolls themselves, but also the "load means" which is set atop the 3 in. roll and the requisite auxiliary "drive means" (chains and sprockets). In short the ROLAKLEEN package includes everything that is to be installed between the doffer and calender rolls of a conventional cotton carding machine. If its customers do not wish to make the installations themselves, then these customers can hire an Abington outfitter to come to their cotton mills and make the installations. Since the ROLAKLEEN package can hardly be regarded as a "commodity of commerce suitable for substantial noninfringing use," much less as a staple, plaintiff is charged with knowledge of these facts, plus knowledge that the ROLAKLEEN package is "especially made or especially adapted for use in an infringement of such patent" (the Varga patent in suit) by its cotton mill customers as of October 10, 1961, the issue date of the patent. 35 U.S.C. § 271(c).

■■■ With regard to the marking and notice requirements of 35 U.S.C. § 287, which plaintiff's counsel implied at the trial should have been met, but were not met prior to June 11, 1962, these requirements were never applicable to defendant or to its American licensee, neither of which has manufactured or sold the "patented article" (a cotton carding machine) in this country. The Court also notes that plaintiff stresses this failure to mark defense in its Brief After Trial, apparently without realizing that such a defense is totally inconsistent with plaintiff's patent misuse defense.

Either defendant is selling the "patented article" for all purposes, or defendant is not selling the "patented article" for all purposes. Plaintiff cannot have it both ways. Since the Court agrees with plaintiff for purposes of its patent misuse defense that defendant (through its American licensee) is not selling the "patented article" of the patent in suit in this country, therefore the Court must necessarily agree with defendant that it was not making or selling the "patented article" of the patent in suit in this country during the period from October 10, 1961 to June 11, 1962. Thus the marking and notice requirements of 35 U.S.C. § 287 are not applicable, and defendant is entitled to recover damages for infringements occurring since October 10, 1961.

In view of the possibility that plaintiff may have interpreted the trial statement of defendant's counsel as a conclusive waiver of the right to recover damages for infringements prior to June 11, 1962, the Court expressly reserves to plaintiff the right to introduce any evidence at the accounting which might tend to change the Court's present conclusion that the period of recoverable damages commenced on October 10, 1961, rather than on June 11, 1962.

In deciding this case, the Court has granted great weight, in accord with the principle of comity, to the Opinion of Judge Elliott in the Georgia case, wherein opposite conclusions were reached on both issues of validity and contributory infringement. The fact that the Courts have arrived at opposite conclusions cannot, of course, be construed as any indication of error on the part of either Court. Judge Elliott decided the Georgia case on the basis of the record in his Court, and the present case is decided on the basis of the full record in this Court. It goes without saying that the two records are different, just as the two accused infringers (Abington and Lummus) and the two accused devices (ROLAKLEEN and TRASH-MASHER) are likewise different. See Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949.

The Court is further of the opinion that much, perhaps most, of the evidence as to the many differences between the woolen, worsted, cotton condenser and fine cotton systems, and the prior use of the Harmel burr crushers and Peralta crush rollers in woolen, worsted and cotton condenser processing, but not in the fine cotton process with which the Varga invention of the patent in suit is concerned, was not made of record in the Georgia case. Based on a thorough consideration of all the evidence in the present case, including, among other things, the file history of the patent in suit, and all the testimony presented during the trial of this case, which lasted two full weeks, the Court has made the aforesaid findings of fact which lead to the following conclusions of law:

1. Defendant is the owner of U. S. Patent No. 3,003,195 in suit and of all rights of recovery for infringement thereof.

2. The constructive invention date of the patent in suit is November 26, 1957, the filing date of the British counterpart application. 35 U.S.C. §§ 104, 119.

3. The invention of the patent in suit is not anticipated under 35 U.S.C. § 102 by any of the prior art patents and publications relied upon by plaintiff. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177 (1881).

4. The invention of the patent in suit was not anticipated under 35 U.S.C. § 102 by prior knowledge, public use, and sale of plaintiff's ROLASLIVUP take-off roll device. Tilghman v. Proctor, 102 U.S. 707, 711, 26 L.Ed. 279; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523.

5. The claimed subject matter as a whole of claims 2 to 4 of the patent in suit would not have been obvious under 35 U.S.C. § 103 to a person having ordinary skill in the art of fine cotton processing at the time the Varga invention was made in 1957. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527.

6. Claims 2 to 4 of United States Patent No. 3,003,195 in suit are valid. 35 U.S.C. § 282.

7. The claimed subject matter of method claim 1 of the patent in suit would have been obvious to a person having ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103.

8. Claim 1 of the Varga patent in suit is invalid. 35 U.S.C. § 282.

9. United States Patent No. 3,003,195 in suit is enforceable, there having been no proven misuse of this patent. 35 U.S.C. § 271(d).

10. Plaintiff has contributorily infringed, under 35 U.S.C. § 271(c), claims 2 and 3 of the patent in suit by selling four constructions of its ROLA-KLEEN device, together with associated gears, brackets and other parts, for use on cotton carding machines. Defendant is entitled to recover damages for all such contributory infringements as have occurred since the issuance of the patent on October 10, 1961. Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964); 35 U.S.C. § 284.

11. Plaintiff has also contributorily infringed, under 35 U.S.C. § 271 (b), claims 2 and 3 of the patent in suit by actively inducing its customers to directly infringe those claims. Defendant is entitled to recover damages for all such contributory infringements as have occurred since the issuance of the patent in suit on October 10, 1961. 35 U.S.C. § 284.

12. Since neither defendant nor its United States licensee has made or sold the entire combination of elements claimed in claims 2 to 5 of the patent in suit in this country, the patentee has had no opportunity to mark the entire claimed combination in accordance with 35 U.S.C. § 287, and it was, therefore, unnecessary for the patentee to give the formal notice of infringement of June 11, 1962 to plaintiff as a prerequisite to its right to recover in this action. Aro Mfg. Co. v. Convertible Top Replacement

Co., 377 U.S. 476, 490 n., 514, 84 S.Ct. 1526 (1964).

13. Plaintiff's Complaint for a declaratory judgment of invalidity of defendant's U. S. Patent No. 3,003,195, and for a further declaratory judgment of noninfringement of this patent in suit by plaintiff's ROLAKLEEN device, is dismissed as to claims 2 to 4, but is sustained as to claim 1.

14. Plaintiff is entitled to an injunction to prevent defendant, and those acting in concert with it, from maintaining or bringing any other suits, claims, or causes of action, against plaintiff, its licensees, customers and assigns, under method claim 1 of the patent in suit, and from threatening to do so. 35 U.S.C. § 283.

15. Defendant is entitled to judgment on its counterclaim for damages adequate to compensate for plaintiff's contributory infringements, such damages to be subsequently assessed, and defendant is also entitled to a permanent injunction during the term of U. S. Patent No. 3,003,195 against further infringing acts by plaintiff, its agents, and those in privity with plaintiff. 35 U.S.C. §§ 283, 284.