57 CCPA

**Frederick H. NORTON, Appellant,**

v.

**Lawrence E. CURTISS, Appellee.**

**Patent Appeal No. 8332.**

United States Court of Customs and Patent Appeals.

Nov. 12, 1970.

Rehearing Denied Feb. 11, 1971.

Amster & Rothstein, New York City, attorneys of record, for appellant. Morton Amster, James Reisman, New York City, William C. Nealon, Southbridge, Mass., of counsel.

W. Philip Churchill, Fish & Neave, New York City, for appellee. Lee C. Robinson, Jr., John A. Howson, New York City, of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and FISHER, Chief Judge, Eastern District of Texas, sitting by designation.

BALDWIN, Judge.

Norton appeals from the decision of the Board of Patent Interferences awarding priority to Curtiss of the two counts in interference No. 93,002 involving the applications [1] of the two parties.[2] Curtiss is the senior party because of his earlier filing date. Both parties have presented considerable evidence in the nature of testimony and documentary as well as physical exhibits.

### The Invention of the Counts

The invention at issue deals with the art which has come to be called "fiber optics". In this field, optical fibers, made of flexible, light-transmitting material and having a very small diameter, are used instead of conventional lenses and mirrors to transmit light and images. Many thousands of these fibers are bound together to form what is said to be known in the art as a "bundle". When the individual fibers making up the bundle are arranged at each end of the bundle in the same relationship that they bear to each other at the opposite end of the bundle, the result is called a "fiberscope", which, when properly made

1. Curtiss application Serial No. 657,325, filed May 6, 1957, entitled "Method For Forming Glass Fibers".
    Norton application Serial No. 43,752, entitled "Fiber Optical Components", filed July 19, 1960, as a division of application Serial No. 669,883, filed July 3, 1957.

2. The real parties in interest are American Optical Co. (AO), owner of the Norton applications, and American Cystoscope Makers, Inc., exclusive licensee of the Curtiss application. Through assignments, Dr. Basil I. Hirschowitz and Dr. C. Wilbur Peters, co-workers of Curtiss when he developed the invention at issue and whose names will appear later on in this opinion, are each owner of one-third interest in the Curtiss application before us.

of the right kind of fibers, constitutes an image-transmitting device. Such instruments are extremely useful for looking into what are otherwise practically inaccessible areas, such as the interior of the human stomach or that of an engine or other complicated apparatus. Needless to say, there are many other light and/or image transmitting uses.

Count 1 of the interference relates to a single light-transmitting optical fiber having a glass core of a relatively high index of refraction [3] and a glass coating (or cladding) of a relatively lower refractive index. The count is reproduced below:

> 1. A flexible optical light transmitting glass fiber for use in forming a flexible image transmitting device made up of a plurality of such fibers in side-by-side relation, comprising an elongated optically clear glass fiber core formed of glass of a predetermined index of refraction and being of substantially uniform cross section from end to end thereof, said glass core having a relatively thin glass coating of substantially uniform thickness fused to its entire outer surface, said glass coating having an index of refraction which is lower than that of said glass core and being adapted to prevent light from escaping from said core into said coating said core having a thickness of up to about 0.002 inch.

Count 2 is drawn to "an optical light transmitting device, comprising a large number" of the fibers of count 1.

Each party attempted to establish priority in the proceedings below by showing that he conceived the invention be-fore the other and that he either actually reduced it to practice first or was diligent in reducing it to practice from a time before the other's conception until his own reduction to practice. After a detailed analysis of the evidence, the board concluded that Norton had satisfactorily proved conception of the invention no earlier than April, 1957. It was further concluded that, while Norton had demonstrated diligence, he had proved no actual reduction to practice prior to his application filing date of July 3, 1957. With regard to the party Curtiss, the board found that Curtiss was in possession of a complete and operative conception of the invention of the counts in December of 1956. That holding, coupled with its finding that Norton did not prove conception before April, 1957, or reduction to practice prior to his July 3, 1957, filing date, compelled the decision that Curtiss was the first to conceive and the first to reduce to practice even if he were restricted to his May 6, 1957 filing date as a reduction to practice. Apparently for that reason, the board specifically refrained from making a holding whether Curtiss had *actually* reduced the invention to practice in December 1956 or at any other specific time before his filing date.

The parties here have fully contested the priority issues. However, before we can reach those issues we must resolve an additional issue. The party Norton has charged that Curtiss committed fraud on the Patent Office during the ex parte prosecution of his application and that, as a result of this fraud, the Curtiss application should be stricken under Patent Office Rule 56 [4] and "priority" awarded to Norton.

---

3. Index of refraction (or, refractive index) may be considered as a relative measure of the extent to which light rays will be "bent" upon passing from one medium into another. Theoretically, it is obtained by taking the ratio of the velocity of light in the particular medium under consideration to the velocity of light in a vacuum. In the field of fiber optics, the index gives a relative measure of the expected efficiency with which a particular fiber material will internally conduct light. The higher the index of refraction, the better the light transmission.

4. Patent Office Rule 56 provides:
56. *Improper applications.* Any application signed or sworn to in blank, or without actual inspection by the applicant, and any application altered or

## Jurisdiction

At the outset, we are confronted with the contention by Curtiss that the court "is not required" to review the decision below as to Norton's charges of misconduct "because they do not raise a question ancillary to priority." He points out that Norton's charges have to do only with events that occurred some three years after the Curtiss application was filed and urges that because they therefore could not possibly have any effect on priority, they are "strictly a matter for the Patent Office to consider on an *ex parte* basis."

We disagree. If the charges made by Norton are found to be of substance, Curtiss stands to lose, at the least, his right to have those claims in his present application to which the charges relate mature into a patent. That translates, in this case, to a loss of standing as a party to the interference. This question is clearly one which is ancillary to priority and was therefore properly considered by the board and must now be reviewed by this court.[5]

## Background

In order to place this controversy in its proper perspective, it will be neces-sary to give a rather extensive development of the facts as we have derived them from the record. Since the asserted fraud was perpetrated during the prosecution of the Curtiss application, some of this discussion will relate to what went on during ex parte proceedings.

Initially, we point out that the applications of both parties now before us were copending before the same examiner and were being examined concurrently. The position originally taken by the examiner, in both applications, was that the claims directed to the invention now before us were unpatentable because they involved the mere substitution of obviously equivalent materials. The file of the Curtiss application shows that, after the first rejection of his claims, Curtiss and his attorney conducted two interviews with the Primary Examiner and his assistant. No verbatim record of what was said at these meetings was made, but in each case, the attorney followed up the interview with an amendment and, in the accompanying remarks, extensively discussed what transpired at the interview.

With regard to the first interview, we accept the board's summary of the re-

partly filled in after being signed or sworn to, and also any application fraudulently filed or in connection with which any fraud is practiced or attempted on the Patent Office, may be stricken from the files.

5. Before this original brief was due in this appeal, appellant Norton filed a motion to remand the case to the Patent Office. We deferred decision until this time. The motion was based on Norton's concern that the court would not take jurisdiction over the fraud question since certain relevant facts pertaining to that question had been developed subsequent to the original proceedings before the Commissioner and had not been presented to him for further consideration. In Vandenberg v. Reynolds, 242 F.2d 761, 44 CCPA 873 (1957), it was held that any decision as to whether an application should be stricken should be decided "in the first instance" by the Commissioner. Having considered the question and the positions of the parties, as well as the authorities cited in their support, we now deny that motion. We find that the action taken by the Ass't Commissioner in his decision on the initial petition to strike, citing the probability that the board would necessarily consider many of the matters relevant to the fraud question, and enjoining that body to make an appropriate recommendation under Rule 259 if it found fraud to exist, was tantamount in its effect to a direct delegation of the responsibility to make any further findings regarding the question of fraud. We find no problem with such delegation. The board fully disposed of all questions relating to the fraud issue. Since that issue is a necessary preliminary to any finding that the application should be stricken, the board's decision was obviously determinative of the question. As such, it is within our jurisdiction to review. *Compare* the second opinion in Vandenberg v. Reynolds, 268 F.2d 744, 46 CCPA 938 (1959) *with* Sundback v. Blair, 47 F.2d 378, 18 CCPA 1016 (1931).

marks accompanying the ensuing amendment:

In the amendatory remarks, Curtiss' attorney acknowledged the interview of July 20, 1960 and stated that "an image transmitting fiber bundle containing glass-coated glass fibers" was there demonstrated, that the examiners "immediately recognized the superior and outstandingly unique properties of this image transmitting device", and that the examiners suggested "that applicant submit an affidavit in support of the fact that applicant's glass-coated glass fibers have properties so different from and so superior to plastic-coated fibers that applicant's glass-coated glass fibers and fiber bundles made therefrom represent an important and patentable advance over the prior art."

In the affidavit which accompanied these remarks (filed at the suggestion of the examiners) Curtiss swore, inter alia, that prior to this filing date of May 6, 1957, *he* had *made and compared* [6] both glass-coated and plastic-coated fibers using the same type of glass for the core material of each, the plastic and glass coating materials used being of the same index of refraction; that a comparison of equal lengths of the two fibers as originally made showed that "the plastic-coated fibers were markedly inferior in transmitting light than the glass-coated fibers, that the plastic-coated fibers in relatively short lengths of about 12 inches or less had only marginal usefulness even when used with extremely brilliant light sources and that long lengths of such plastic-coated fibers were entirely useless for transmitting light."

The affidavit concluded with a paragraph describing a specific test comparison of the two types of fibers, performed on or about October 6, 1960, and using samples which Curtiss had prepared. It was stated that "the glass-coated fiber specimens transmitted sufficient light to permit their being satisfactorily used in a light transmitting device." On the other hand, it was stated that the plastic-coated fiber specimens "were entirely unsatisfactory for use in a light transmitting device" and were "virtually incapable of transmitting light except for such light rays which happen to pass axially through the fiber essentially without the occurrence of internal reflections."

The examiner responded that this affidavit was not persuasive and made the rejection final. Curtiss requested a second interview. As to what went on at that second interview, we also accept the board's summary of the follow-up amendment:

In the amendatory remarks, Curtiss' attorney acknowledged the interview of October 25, 1961, and stated that the Examiner had "indicated his recognition of applicant's contribution to the art." He explained the arguments presented at the interview "at length," viz.: (a) that the fiber optics art had fallen far short of attaining predicted goals in spite of considerable effort over more than thirty years; (b) that a homogeneous fiber in contact only with ambient air would theoretically provide a virtually perfect light conductor; (c) that a fiber in such an environment may provide only a "laboratory curiosity," due to "the impossibility of keeping the individual fibers sufficiently clean or out of contact with one another so as to prevent excessive light loss;" (d) that it had been recognized prior to Curtiss' invention that if a coating with a material of lower index of refraction were properly applied the amount of light escaping "could be reduced to a tolerable level;" (e) that in practice use of such materials had been "found to be unsuited for the provision of optical fibers other than extremely short ones;" (f) that this shortcoming was believed to be "primarily because of the failure to eliminate imperfections in the coating and particularly at the

6. The reason for the emphasis here will become apparent later on in the opinion.

interface;" (g) that Curtiss had discovered quite accidentally that glass fiber cores could be coated with glass coatings to provide "unique degree of freedom from light loss;" and (h) that Curtiss had demonstrated for the Examiner the "relative conductivity of the two types of fibers discussed in" Curtiss' previous affidavit, viz. those identified later, in this interference, as Curtiss [7] exhibits 11 and 12, respectively. With respect to this demonstration he added:

> "The Examiner was able to see for himself and directly compare the relative conductivity of these fibers. It was apparent that the plastic coated fibers had such inferior light conductivity that very short lengths thereof, one to two inches, had less conductivity than glass coated fibers about ten times as long. The fibers which the Examiner inspected and compared were all made within a period of about two to three months and as was pointed out in said affidavit, the fibers were made prior to May 6, 1957."

We agree with the board that it is fair to assume that the subsequent allowance of claims in the Curtiss application "resulted in substantial measure" from the representations made in the affidavit and during the interviews.

The allowance of Curtiss's claims led the way to the declaration of this interference, the claims which are now the counts having been suggested to both parties.

During the interference motion period, Norton moved to dissolve on the ground that the counts were unpatentable. Citing and applying the same art which had been used against him (as well as certain additional references which had not been cited during the prosecution of either application but which appear to have been only cumulative in their teaching), Norton took the same basic position originally taken by the examiner in rejecting his claims. This motion was denied by a Primary Examiner who apparently had not participated in the original examination of the applications.[8]

It appears that after the interference had been declared and Norton was given access to the Curtiss application, he began to suspect that Curtiss might have made some misrepresentations to the examiner. Accordingly, Norton first took testimony in an attempt to establish that fraud had been committed. Both parties thereafter took testimony on the issue of priority.

After all the testimony had been taken on both issues, Norton then filed a petition asking the commissioner to strike the Curtiss application under Rule 56 on the ground that Curtiss had, during the ex parte prosecution of his application, made fraudulent misrepresentations in an attempt to convince the Patent Office of the patentability of the substitution of glass for plastic as the low index outer coating of an optical fiber.

In support of the petition, Norton asserted that Curtiss had, knowingly and wilfully, deceived the examiner, through affidavit, demonstration and argument, not only as to the state of the art with respect to plastic coated fibers, but in addition, as to Curtiss's own work. He urged that "these were purposeful misrepresentations by Curtiss of relevant and material facts to 'prove' a difference in kind" between his glass-coated fiber and the plastic-coated fibers of the prior art. Specifically, Norton asserted that

---

7. Here the board has to be referring to *Norton* exhibits 11 and 12. See note 10, *infra*.

8. No mention is made in the opinion denying the motion of the fact that the Curtiss application file contained an affidavit and record of a demonstration supposedly showing the superiority of the invention at issue. Nevertheless, we note in passing the possibility that that showing of superiority in the record influenced the Primary Examiner's decision. His opinion makes it appear that he accepted with approval the very same arguments which had been held unpersuasive during ex parte prosecution prior to the demonstration.

Curtiss's statement that "the plastic-coated fibers in relatively short lengths of about 12 inches or less had only marginal usefulness even when used with extremely brilliant light sources and that long lengths of such plastic-coated fibers were entirely useless for transmitting light," was "an out-and-out untruth and Curtiss knew that it was!" He contended that both he, Norton, and Curtiss were aware that plastic-coated fibers were well known in the art to be reasonably good light conductors. The petition stated that the misconduct alleged would be proved "primarily out of the mouth of the applicant Curtiss." To this end, Norton submitted the following items of evidence:

(1) a bundle of plastic coated fibers, (Norton Exhibit 23), approximately one meter in length, made by Curtiss prior to his work with glass cladding. The petition asserted that this bundle had "been recently tested by Curtiss and found to be operative."

(2) a draft made in preparation for a talk delivered by Curtiss to the Optical Society of America in October of 1956 in which Curtiss discussed the work which was being done by him and his co-workers, Hirschowitz and Peters, at the University of Michigan. In that draft, the bundle of plastic-coated fibers mentioned above was described as follows:

"In the bundle constructed with the coated fibers, the contrast was excellent. Unfortunately something went wrong with the resin binding the ends making it cloudy and giving it an index that nearly matches the glass. Therefore the transmission in the bundle is down to just a couple of percent and it will only accept nearly axial rays. This, however, is only a problem of choosing a better resin."

That bundle (N. Ex. 23), was apparently presented at the meeting during the talk. In addition, the paper contains this statement:

"Thus, the two major problems peculiar to long fiberscopes, transmission and contrast, appear to be easily overcome, and usable fiberscopes of 6 feet or more in length (are) a definite possibility." (Norton Exhibit 25, last paragraph).

(3) an article which appeared in the University of Michigan Medical Bulletin entitled "Preliminary Report on a Long Fiberscope for Examination of Stomach and Duodenum", Vol. 23, pp. 178–180 (May 1957). This article was co-authored by Curtiss, Peters and Hirschowitz and corresponds in great detail to the draft of Curtiss's talk. It contains the following statement concerning the bundle of plastic-coated fibers:

The resulting bundle of coated, high-index fibers transmitted a fairly satisfactory image.

(4) United States Patent 3,010,357, to Basil I. Hirschowitz, issued November 28, 1961, but applied for in December 1956, several months after the Optical Society meeting. This patent refers to fiberscopes made with bundles of glass fibers each to be coated with a lower index clear plastic which coating "thereby prevents the passage of light through the coating but retains the light and transmits the light through the length of the tube." Further describing a particular embodiment of the invention there disclosed, a bundle approximately one meter in length, the patent states that it "was found to be extremely highly efficient in the transmission of light, somewhere over the order of 50% efficiency." Pointing out that Curtiss and Hirschowitz had each given the other, as well as Dr. Peters, a one-third interest in their respective applications, that the Curtiss application contained a cross-reference to and "a brief resume of the Hirschowitz application", and that "during the prosecution of the Curtiss application one of the figures of the Hirschowitz application was actually incorporated in the Curtiss specification," Norton urged that

As a co-owner of the Hirschowitz application from at least the Spring of 1957 (R, 16–17), Curtiss must be charged with the unequivocal representations therein that plastic-coated fibers are useful; and that there is

not, as is the thrust of the Curtiss affidavit, a difference in kind between glass-coated and plastic-coated fibers.

On this legal basis, Norton also submitted a letter by Hirschowitz to his patent counsel stating in part:

The length of thin glass fibers to transmit light along the length (1 meter +) required for internal medical examination (as detailed in the patent application for the fiberscope (enteroscope)) requires a technique for containing the maximum possible amount of light within each fiber. In making use of a glass fiber of high refractive index coated with a low refractive index lacquer (as detailed in my previous patent application) a good deal of this objective is obtained.

Believing that he had established, by the foregoing, the falsity of the representations to the examiner, Norton also attempted to prove a "fraudulent motive." In this regard, he first submitted the following letter to Curtiss from Peters, which was sent in response to a telephoned request to send samples for the demonstration before the examiner:

Wed

Dear Larry,

I've scrounged thru all the nooks & crannies I could think of and can't find a thing except some cut off fibers that look like they have a lacquer coat & am sending them under separate cover along with some glass coated ones. It worries me that I can't see any light at all coming thru the presumably lacquered ones. Is it possible that Basil [Hirschowitz] might have the original lacquered bundle? I don't know of any other places to look for it here. I'm all set to run the transmission on the sample & hope to get to [sic] done tomorrow nite.

Pete

He also brought out, through a later letter of Peters and through testimony, that the lacquered bundle, allegedly shown to be more typical of the prior art than what was shown to the examin-er, was available to Curtiss prior to the crucial demonstration. On the basis of this evidence, Norton asked the Commissioner to find that Curtiss knew the fibers compared at the demonstration to have been atypical and a misrepresentation of the prior art and that such misrepresentation amounted to fraudulent conduct.

Curtiss responded to the petition to strike with a comprehensive brief attacking every accusation and argument raised by Norton. Attempting initially to explain what was meant by the statements in the questioned affidavit, Curtiss first summarized "the state of the prior art" and pointed out that

For purposes of transmitting an image, it has been known for many years that a fiber bundle should have both good light transmission and good contrast. One without the other made the bundle unsatisfactory.

He then tried to show, by citations to various prior art patents and journals, that the 12 inch fibers used in the demonstration were not "atypical" in their poor performance. Statements in some of the prior art references indicated that only very short lengths were operable in transmitting light.

As to Norton Exhibit 23, the bundle of plastic-coated fibers displayed at the Optical Society Meeting and Norton's insistence that this was not "entirely useless for transmitting light", Curtiss asserted first, that what he said in paragraph 3 of his affidavit did not mean that he was saying "that plastic-coated fibers were inoperative and did not transmit any light," but that they were "entirely useless for any practical purpose, such as a fiberscope instrument," and that "even if the word 'long' means 3 feet, as Norton argues, the plastic-coated fibers are still entirely unsuitable for use in any practical fiberscope instrument." He then went on to argue that the record shows that Norton Exhibit 23 is, in fact, of no value for use in an image transmitting device, and that "[t]here is no evidence [Norton's assignee] has

ever used plastic-coated fibers for making up any useful fiberscope instrument having a length of even 3 feet." He then asserted that both companies by which the parties' respective applications were controlled "have marketed fiberscope instruments made with such glass-coated fibers."

With regard to the use of the fibers actually shown to the examiners, Curtiss avowed that what he said in his affidavit was accurate as to those fibers and that there was no reason for him to be surprised at the fibers' performance since he knew it was poor to begin with and that the plastic coating had deteriorated over the years.

As to the draft of the speech Curtiss made, it was avowed to the Commissioner that while nothing in that draft was totally inconsistent with the later statements by Curtiss, certain language was nothing more than "optimism" so far as plastic-coated fibers were concerned, that the research on plastic cladding was given up shortly afterwards, and that the optimistic claims never came about "until they had abandoned the plastic-coated fibers and invented the glass-coated fibers."

Curtiss went on to assert, regarding the publication in the Michigan Medical Bulletin, that it was published without authority, and that it contained statements (those relevant to the performance of the plastic-coated fiber bundle) which had been added to Curtiss's notes without his knowledge. He attempted to prove this by certain testimony of Curtiss and Peters and exhibits purporting to be a correct copy of the notes given to the head of the medical department at the University, a Dr. Pollard, and a letter from Dr. Pollard to Peters indicating that the paper had been published without his permission and that he was

"downright annoyed" at this "horrible boner".

The opposition brief also strongly contested Norton's attempt to make the prior statements by Hirschowitz binding upon Curtiss.

Noting first that Norton "apparently does not controvert the applicant's statements as to the superiority of the claimed invention over the prior art," the Commissioner denied the petition with the following language:

> although contradictions in the record of this application are noted, accusations of fraudulent conduct will not be considered lightly and the proof of such conduct must be clear and convincing, especially where, as here, petitioner apparently does not controvert the applicant's statements as to the superiority of the claimed invention over the prior art. In the petition, attention has been directed to certain recollections of Curtiss which were shown to be in error and to his change in opinion as to the effectiveness of the resin-covered fibers. Nevertheless, these occurrences are not believed to prove an intent to deceive and it should be observed that the same type of forgetfulness is evidenced by Norton at Paper No. 42 of Interference No. 93,-002.[9] For each inconsistency raised by petitioner as to Curtiss' actions, Curtiss appears to have provided plausible explanations.

Three days after the Commissioner's decision, Curtiss's attorneys sent a letter to the Patent Office containing the following statement:

> [T]he party Curtiss and his attorneys discovered information of a very disturbing and serious nature which they feel obligated to make of record in this proceeding. It has been learned that the fiber swatches of Norton Exhibits 11 and 12 [10] are not the fibers which

---

9. This appears to be in reference to Norton's motion to amend his preliminary statement to assert certain earlier dates, the evidence of which had "inadvertantly" been overlooked.

10. These exhibits are marked as Norton exhibits because they were originally produced by Curtiss pursuant to subpoena and marked as evidence by Norton during the first deposition of Curtiss, directed to

were demonstrated to the Patent Office Examiner on October 25, 1961 and are not the fibers used during the deposition session of June, 1964.

The letter continued with a chronological statement of the facts leading up to this asserted discovery. It seems that before the exhibits had been handed to the Patent Office, Curtiss's attorney had retained a few fibers and had asked Curtiss to devise a method whereby an exact measurement of the indices of refraction of the core glass and the outer coatings could be obtained. Curtiss did so and his procedure established that exhibit 11, rather than being composed of glass-cored fibers of refractive index 1.69 coated with a plastic having a lower index of refraction in the neighborhood of 1.52, actually contained fibers having a core with a refractive index below 1.52 and a plastic coating of about 1.52 refractive index. The fibers of exhibit 12, instead of being glass-coated glass fibers, were found to be uncoated glass fibers.

The letter concluded with the statement that Curtiss and his attorneys still believed "that the swatches of the two kinds of fibers that were demonstrated by Curtiss to the Examiners in October, 1961 were at that time what they were represented to be," and that they were "presently unable to explain the change in Norton Exhibits 11 and 12."

At this juncture, Norton moved to reopen the interference for the taking of additional testimony, and the conducting of inter partes tests to establish the physical identity of the exhibits and resolve the question of whether the true exhibits were "switched." This motion was granted "in the interests of determining the true facts relating to the origin, custody and handling of Norton Exhibits 11 and 12" and the interference was transmitted to the Office of the Solicitor where a special hearing was conducted directed toward that end. Following that hearing, the case was brought back to the Board of Patent Interferences for a final decision on the merits of the controversy.

We are not exactly sure, from reading its opinion, what the board felt was its responsibility with regard to the fraud charges made by Norton. On the one hand, the board apparently agreed with the position of Curtiss that the question was not ancillary to priority under Vandenberg v. Reynolds, since it stated that the actions objected to occurred "subsequently during prosecution [and] are irrelevant to the status of the application as filed and irrelevant to the question of who was, in fact, the prior inventor." Similarly, it was also stated that "only the Commissioner of Patents has the authority to strike applications from the file" and noted that "the only course of action which this Board could take in securing the result sought by Norton would be to make such recommendation to the Commissioner." Nevertheless, the board did review "all portions of the record pertinent to this question" and in a section of its opinion extending beyond 14 printed pages of record, thoroughly discussed the facts surrounding the charges of fraud and "concluded that there is no adequate basis for a holding that Curtiss has committed any fraud upon the Patent Office, and we shall therefore not make such a recommendation."

Initially, the board stated that it felt that "the question of whether the glass-coated fibers differ *in kind* and not just *in degree* from plastic-coated ones, or at least whether Curtiss believed that they so differed, is relevant to the issue of fraud." It was then noted that the record presented by Norton contained nothing "to cast doubt upon the conclusion that Curtiss believed as early as the winter of 1956–57, and still believes, that such difference in kind exists." Specific mention was then made of certain *ante litem motem* statements of Curtiss and his co-worker, Hirschowitz as to the special merits of the glass-coated fibers, and

the fraud question. After being marked by Norton, they remained, however, in the custody of Curtiss's attorney until filed in the Patent Office.

it was pointed out that consideration of the issue of patentability had been settled.

The board thereafter went on to express its opinion that, as a witness, Curtiss had impressed them as being "a man who tries to speak the truth with precise intricacy" that "the worst that can be said" for his statements before the Patent Office "is that the issue is oversimplified, that there is some exaggeration, and that a mistake may have been made in identifying fibers shown to the Examiner," and that Norton "has himself distorted the record"[11] and "has sought to have the issue of fraud tried in an atmosphere of passion instead of objective analysis."

In reviewing the evidence the board first agreed with the Commissioner's holdings that Curtiss had provided plausible explanation for each inconsistency raised by Norton and that the occurrences of certain misstatements as to the effectiveness of the plastic-coated fibers did not prove an intent to deceive. With regard to the special hearing concerning the possible switching of the samples of glass fibers said to have been the ones used during the questioned demonstration, the board first observed that

> There was no testimony tending to prove that any specific act had been done to change Norton exhibits 11 and 12 between the date of their production by Curtiss in June 1964 and their submission to the Patent Office in October of that year, and in fact these exhibits were in the custody of Curtiss' own attorney during most of this time. The most significant testimony, in our judgment, was by Norton's expert, Dr. W. Lewis Hyde, who testified * * * that the examination by Curtiss of the fibers of Norton Exhibit 12 under the microscope was inadequate to distinguish glass coated

glass fibers, which Curtiss alleges they were, from uncoated glass fibers of high index, which both parties agree they now are.

From this, the board went on to state that "we have no reason to assume, from any positive testimony, that the present Norton exhibits 11 and 12 are not the very same fibers exhibited to the Examiner." Having said that, however, the board then hedged, noting that

> There is always the possibility of some switch or change, accidental or otherwise, in items which have had so much handling and attention, and the testimony of the Curtiss witnesses at the Special Hearing may cast some doubt as to identity.

It was finally decided to "assume for the purpose of our further discussion that the present Norton exhibits 11 and 12 are the very fibers used in the demonstration."

At this point, the board stated what it felt to be the applicable law on the subject as follows:

> to subject Curtiss to the penalty of forfeiture on the ground of fraud the supporting proofs must show by evidence that is clear, positive, cogent and convincing:
>
> A. That there was knowledge by Curtiss that the information which he gave the Patent Office was false.
>
> B. That such false information was essentially material to the allowance of his claims.
>
> C. That there was a fraudulent motive, i. e., a degree of "irresponsibility in utterance which is tantamount to wilfulness."

The board then went on to summarily dismiss the charges of fraud aimed at Curtiss's qualitative statements concerning the performance characteristics of

---

11. This comment refers to the repeated use by Norton's attorney of the characterization "scrounged up" to refer to the fibers demonstrated to the examiner by Curtiss. This, of course, emanates from the letter of Peters transmitting the fibers to Curtiss, wherein Peters wrote that he had "scrounged thru all the nooks & crannies I could think of." We agree with Norton that the characterization is an apt one.

plastic-coated fibers and the withholding of Norton Ex. 23 (the plastic-coated fiber bundle). As to the former, it was noted that

> the relatively poor performance in these years of the plastic coated fibers as compared to the glass coated ones is confirmed not only by Curtiss' ante litem motem writings but also by the testimony of Norton's witnesses Hicks and Hyde * *. *. We note further that Curtiss has not at any point represented that the performance of his plastic coated 1956 fibers was as poor in comparison with his glass coated ones as was Norton Exhibit 11 in 1961 in comparison with Norton Exhibit 12; in fact, his attorney made a specific point of the opinion held by Curtiss that the plastic deteriorates upon aging, and by implication that the performance of Exhibit 11 was admittedly not nearly so good in 1960 and 1961 as in 1956 or 1957.

Concerning the latter, the board stated that a comparison of the glass-coated fibers with Norton Exhibit 23 "would have demonstrated the required 'difference in kind', although the comparison would not have been a fair one in view of the known defects of a perhaps avoidable character in Exhibit 23."

Finally, the board considered the issue of whether Curtiss had committed fraud in representing the actual fibers compared to be different from what they actually were. It pointed out first that Curtiss's "good faith in producing these exhibits and in later bringing the discrepancies to the attention of the Patent Office are factors tending to belie the accusation that he has been guilty of intentional misrepresentation." Then going on to consider whether Curtiss was fraudulently neglectful, the board held that, while "it was a deplorable fact that such an unfair comparison was made in the demonstration before the Examiner," and, on hindsight, "Curtiss should have investigated further before making his representations to the Patent Office," the record failed to support a finding that Curtiss had "committed fraud in assuming that the fibers were as stated."

## OPINION

As far as we have been able to determine, this is the first occasion on which this court has been asked to review an action of the Patent Office dealing with charges of fraudulent misconduct. The importance of the questions raised in this case requires consideration in some detail.

■ Regarding the question of Norton's fraud charges, the only issue we have power to decide is whether the Commissioner abused his authority in holding that the conduct of Curtiss did not warrant striking his application under Patent Office Rule 56. Compare Vandenberg v. Reynolds, 268 F.2d 744, 46 CCPA 938 (the second decision, 1959). We will resolve this question by first determining the standards of law which the Commissioner was required to apply in arriving at his decision, and then by determining whether the evidence presented justified the decision made.

■ Initially, we observe that the statutes contain no express grant to the Commissioner of authority to strike an application for patent. Such authority must be found in 35 U.S.C. § 6, which gives the Commissioner authority to establish regulations governing the conduct of proceedings in the Patent Office. We have long held that such regulations, when not inconsistent with the statutes, have the force and effect of law. See, e. g., Piel v. Falkner, 426 F.2d 412, 57 CCPA 1132 (1970). The Commissioner's authority to strike, under present Patent Office Rule 56, as well as its predecessor, Rule 31, has been the subject of court consideration before and has not been questioned. See Vandenberg v. Reynolds, 242 F.2d 761, 44 CCPA 873 (1957); Lindstrom v. Ames, 37 App. D.C. 365, 1911 C.D. 384. We do not question it now. It is true that the question of the Commissioner's power to deal specifically with fraudulent misconduct has never before been the subject of di-

rect court review. However, we find ourselves in complete accord with the reasoning of Commissioner Ooms in holding that where the courts have approved the striking of an application for conduct less serious than fraud, it must follow that "a deliberate fraud in an attempt to secure the allowance of a claim affords a basis for similar action." Ex parte Mallard, 71 USPQ 294 (Com'r Pats. 1946).

■ Heretofore, it appears that the action of the Commissioner in striking an application has always been preceded by the finding of a court that a fraud had been committed. Nevertheless, we can see no reason, in logic or in law, why such a finding may not be made within the Patent Office. Having established that the Commissioner may strike an application for conduct which he finds to be fraudulent, however, the question remains concerning the standards to be applied in making such a finding. The term "fraud" is not defined in the rules and we have been unable to find elsewhere any authoritative interpretation of that word as used in Rule 56. It follows then, that this court is called upon, as it so often is, to construe a term in an administrative regulation.

■ Here, however, we have not been left to our own resources. We have been aided by the following unquestionable logic in the Commissioner's opinion in In re Heany, 1911 C.D. 139, 154, 171 O.G. 983 (1911):

if the Commissioner should find from evidence duly taken in accordance with the law that an application or applications are so permeated with fraud as to justify the opinion that any patent or patents granted on those applications, whether amended or not, would be annulled or set aside by a court of equity on petition of the United States through the Attorney-General, on the ground that the patent was obtained through fraud, then it would be the duty of the Commissioner, under the law, to refuse, upon that ground, to grant such a patent.

We take this to indicate that any conduct which will prevent the enforcement of a patent after the patent issues [12] should, if discovered earlier, prevent the issuance of the patent. The only rational, practical interpretation of the term "fraud" in Rule 56 which could follow is that the term refers to the very same types of conduct which the courts, in patent infringement suits, would hold fraudulent.

■ We note first that traditionally, the concept of "fraud" has most often been used by the courts, in general, to refer to a type of conduct so reprehensible that it could alone form the basis of an actionable wrong (e. g., the common law action for deceit). That narrow range of conduct, now frequently referred to as "technical" or "affirma-

12. It will be noticed that the opinion in *Heany* refers to a petition by the United States to set aside the patent on the grounds that it had been fraudulently procured. At the time of that opinion, it was the prevailing law that only the United States could raise the issue of such fraud and then only in a suit by the Attorney General to cancel (revoke) the patent grant. United States v. American Bell Telephone Co., 128 U.S. 315, 32 L.Ed. 450 (1888); Mowry v. Whitney, 81 U.S. 434, 20 L.Ed. 858 (1871). Since that time, however, the Supreme Court has recognized the right of a private party to assert that a patent has been procured by fraud practiced on the Patent Office,—first, as an equitable defense to an infringement charge, Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); more recently, as an element of an affirmative counterclaim of antitrust violation. Walker Process Equipment Co. v. Food Machinery and Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed. 2d 247 (1965). As a result, there have been many occasions on which other courts have been called upon to evaluate charges of misconduct similar to those the party Norton is asserting here, and patents have been held unenforceable on the ground of fraudulent procurement for reasons not substantially different from those for which patents have been cancelled.

tive" fraud, is looked upon by the law as quite serious. Because severe penalties are usually meted out to the party found guilty of such conduct, technical fraud is generally held *not* to exist unless the following indispensable elements are found to be present: (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation. See, e. g., W. Prosser, Law of Torts, §§ 100–05 (3d ed. 1964); 37 C.J.S. Fraud § 3 (1943).

But the term "fraud" is also commonly used to define that conduct which may be raised as a defense in an action at equity for enforcement of a specific obligation. In this context, it is evident that the concept takes on a whole new scope. Conduct constituting what has been called earlier "technical fraud" will, of course, always be recognized as a defense. However, in these situations, failure, for one reason or another, to satisfy all the elements of the technical offense often will not necessarily result in a holding of "no fraud". Rather the courts appear to look at the equities of the particular case and determine whether the conduct before them—which might have been admittedly less than fraudulent in the technical sense—was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct. It might be said that in such instances the concept of fraud becomes intermingled with the equitable doctrine of "unclean hands". A court might still evaluate the evidence in light of the traditional elements of technical fraud, but will now include a broader range of conduct within each of those elements, giving consideration to the equities involved in the particular case.

In suits for patent infringement, unenforceability, as well as noninfringement or invalidity under the patent laws, is a statutory defense. See 35 U.S.C. § 282(1). We have noticed that unenforceability due to fraudulent procurement is a rather common defense. In such circumstances, we find that the courts are generally applying equitable principles in evaluating the charges of misconduct alleged to be fraudulent. Thus, in suits involving patents, today, the concept of "fraud" on the Patent Office (at least where a patentee's conduct pertaining to the relative merits of his invention is concerned), encompasses not only that which we have earlier termed "technical" fraud, but also a wider range of "inequitable" conduct found to justify holding a patent unenforceable. The courts differ as to the conduct they will recognize as being sufficiently reprehensible so as to carry with it the consequences of technical fraud. Nevertheless, one factor stands clear: the courts have become more critical in their interpretation of the relationship existing between applicants for patent and the Patent Office and their scrutiny of the conduct of applicants in light of that relationship. Not unlike those appearing before other administrative agencies, applicants before the Patent Office are being held to a relationship of confidence and trust to that agency. The indicated expansion of the concept of "fraud" manifests an attempt by the courts to make this relationship meaningful.

This court does not wish to indicate approval of specific holdings or of every manner and way in which other courts have handled the question of fraud in the procurement of a patent. Nevertheless, we do subscribe to the recognition of a relationship of trust between the Patent Office and those wishing to avail themselves of the governmental grants which that agency has been given authority to issue. The ex parte prosecution and examination of a patent application must not be considered as an adversary proceeding and should not be limited to the standards required in inter

partes proceedings. With the seemingly ever-increasing number of applications before it, the Patent Office has a tremendous burden. While being a fact-finding as well as an adjudicatory agency, it is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential. It follows, therefore, that we do approve of the indicated expansion of the types of misconduct for which applicants will be penalized.

In the present case, the charges of fraud are basically three-pronged. The party Norton asserts first, that the representations made in the affidavit and demonstration by Curtiss as to the performance characteristics of plastic-coated fibers amounted to an unfair denigration of the actual state of the prior art. He also charges that Curtiss deliberately withheld the bundle comprising Exhibit 23 from the Patent Office, knowing that its performance was better than the plastic-coated fibers actually shown to the examiners. Finally, Norton urges that Curtiss fraudulently misrepresented the actual construction of the fibers employed to overcome the rejection. The Commissioner considered the first two charges in deciding the motion to strike. The board had before it all three.

We have found it helpful to approach the law to be applied here on an analytical basis, considering seriatim each one of the elements of "technical" fraud, as we listed them earlier, and determining in what manner it has been affected by the broadening of the concept of "fraud" before the Patent Office. We will then evaluate Norton's charges in light of that determination.

■ Our analysis first requires an evaluation of the representations made by Curtiss. It should be immediately apparent that the affidavit and the comments made by Curtiss's attorney regarding the comparison demonstration before the examiners are to be scrutinized for accuracy. We hasten to add, however, that the inquiry is not so narrow. Where, as here, an applicant attempts to overcome a rejection by submitting a comparative showing of properties, the very act of submitting that showing, apart from what is represented therein, must also be regarded as a representation. The most meaningful comparison, in such instances, would be that between the claimed invention and the best embodiment of the prior art available. Therefore, in submitting evidence of comparative tests, unless the circumstances indicate the contrary, an applicant must be held to be representing that his showing includes a fair and accurate demonstration of the closest prior art of which he is aware.[13]

Of critical concern in analyzing the first element is the question of the scope to be accorded the concept of materiality. In technical fraud, to be "material", the fact misrepresented must be "the efficient, inducing, and proximate cause, or the determining ground" of the action taken in reliance thereon. 37 C.J.S. Fraud § 18 (1943). In patent cases, "materiality" has generally been interpreted to mean that if the Patent Office had been aware of the complete or true facts, the challenged claims would not have been allowed. See e. g., Charles

---

13. In the case before us, then, Norton's charges that the plastic-coated fibers used in the comparison were not representative of the true state of the prior art, and that a better example of the prior art (Exhibit 23) was knowingly withheld by Curtiss, are actually separate elements of an attempt to establish the same thing, i. e., that the comparison submitted was a misrepresentation. The situation is therefore not similar to that in which pertinent prior art is withheld when no facts are represented to the Patent Office. We express no opinion on that situation.

Pfizer & Co. v. FTC, 401 F.2d 574 (6th Cir. 1968).

■ However, the above test cannot be applied too narrowly if the relationship of confidence and trust between applicants and the Patent Office is to have any real meaning. Findings of ma- teriality should not be limited only to those situations where there can be no dispute that the true facts, or the complete facts, if they had been known, would most likely have prevented the allowance of the particular claims at issue or alternatively, would provide a basis for holding those claims invalid. In such cases, the claims at issue would probably be invalid, in any event, because of the *existence* of those facts, *in and of themselves*. Whether the claims would also be unenforceable because a fraud was committed in misrepresenting the facts to the Patent Office would really be of secondary importance.[14] It is our view that a proper interpretation of the "materiality" element of fraud in this context must include therein consideration of factors apart from the objective patentability of the claims at issue, particularly (where possible) the subjective considerations of the examiner and the applicant. Indications in the record that the claims at issue *would* not have been allowed but for the challenged misrepresentations must not be overlooked due to any certainty on the part of the reviewing tribunal that the claimed invention, viewed objectively, *should* have been patented. If it can be determined that the claims would *not* have been allowed *but for* the misrepresentation, then the facts were material regardless of their effect on the objective question of patentability.[15] In the case before us, we feel that both the Commissioner and the board placed too much emphasis on the apparently conceded fact of superiority of the glass-coated fibers to plastic-coated fibers and, in doing so, discounted the obvious fact that the examiner had allowed the claims which became the counts at issue directly as a result of the representations made by Curtiss in the challenged demonstration.

Whether the representations made to the Patent Office, either expressly or impliedly, were false, is simply a question of fact, to be decided on the evidence submitted. We will discuss that evidence, shortly.

■ The state of mind of the one making the representations is probably the most important of the elements to be considered in determining the existence of "fraud". Perhaps it is most of all in the traditional element of "scienter" that the existence of a fiduciary-like duty should have its effect. As we have already indicated, the procurement of a patent involves the public interest, not only in regard to the subject matter of the patent grant, but also in the system under which that grant is obtained. Conduct in this area necessarily must be judged with that interest always taken into account and objective standards applied. Good faith and subjective intent, while they are to be considered, should not *necessarily* be made controlling. Under ordinary circumstances, the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant draw-

---

14. It might be important, however, where used to justify an award of reasonable attorney's fees, see, *e. g.*, Townsend Co. v. M.S.L. Industries, 143 USPQ 352 (N.D. Ill.1964) aff'd, 359 F.2d 814 (7th Cir. 1966) ; and, of course, may be of crucial importance where such a patent is knowingly attempted to be enforced. *Walker Process, supra.* See also, Niro & Wigert, Jr., Patents, Fraud and the Antitrust Laws, 37 Geo.Wash.L.Rev. 168 (1968).

15. Witness, for example the following language of our late colleague, Judge Jackson, sitting as a trial judge in Abington Textile Works v. Carding Specialists Ltd., 148 USPQ 33 (D.D.C.1965) at 46:
   If it is established convincingly that a patentee made a deliberate, intentional misrepresentation to the Patent Office during prosecution of his application, then his patent may be declared invalid on that ground alone, *even though the patent might otherwise be valid in every respect.* (Emphasis added).

ing the inference that there was a fraudulent intent. Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth. The Commissioner and the board, by apparently giving controlling effect on this point to Curtiss's subjective belief that his invention was superior narrowed the requirement almost to that of proving actual intent. This was error.

■ Reliance and injury are the two remaining elements to be considered. In this case, of course, we have already pointed out the finding of the board that the Curtiss claims were allowed "in substantial measure" as a result of the representations made in the affidavit and demonstration. Reliance is thus not in issue here, nor can there be any doubt that the examiner's reliance was justified. With regard to the element of injury, we need only repeat the words of the Supreme Court:

A patent by its very nature is affected with a public interest. \* \* The far reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Where fraud is committed, injury to the public through a weakening of the Patent System is manifest.

■ From our evaluation of the evidence which was before the Patent Office here, we are not convinced that the Commissioner erred in refusing to find "fraud" in regard to Norton's first charge. We note first that the statements made in the affidavits and in the discussions by Curtiss's attorney regarding the demonstration before the examiners appear to be accurate *at least insofar* as they apply to the actual plastic-coated fibers actually described and used by Curtiss. So viewed, there was no literal misrepresentation. However, as we indicated earlier, if the level of performance of the plastic-coated fibers actually employed in the comparison was *below* that of the best prior art known to Curtiss, then the statements made to the examiner, regardless of their literal truth, could still amount to misrepresentation by implication. Since the most relevant, meaningful comparison would necessarily have to have been between the claimed glass-coated fibers and the *best* plastic-coated fibers available to the prior art, Curtiss's statements must be considered as an implied representation that, as far as he knew, he was making such a comparison. On this point we note that the record is singularly unclear as to the actual state of the prior art with regard to the performance levels of plastic-coated fibers. It is true that the record includes a number of instances which tend to show that, prior to the subject comparison, Curtiss was aware of plastic-coated fibers possessing a better level of performance than the fibers of Exhibit 11, the fibers actually shown to the examiners. There is also mention in the testimony of Norton's witness Hicks that Norton's assignee possessed plastic-coated fibers which performed better than the fibers of Exhibit 11. Notwithstanding this, we can find no indication in the record, much less convincing proof, that the particular fibers referred to were in fact *prior art* fibers, i. e., that they were available to the art generally at the time Curtiss made his claimed invention. We find this deficiency fatal to Norton's case.

Our comments above apply equally to the second prong of Norton's attack, i. e., that Curtiss withheld material evidence (Exhibit 23). Again we point out that it has not been proved that Exhibit 23

is representative of the prior art.[16] The mere fact that Curtiss knew of its existence before he invented the glass-coated fibers does not negate this. One's own knowledge is not necessarily that to be attributed to the art generally. Norton failed to establish the falsity of Curtiss's representation to the Patent Office regarding the performance level of his claimed invention vis-a-vis that of the prior art.

Finally, in connection with the charge that Curtiss fraudulently misrepresented the actual construction of the fibers demonstrated before the examiners, we are satisfied that there is substantial evidence in the record to support the board's conclusion that Curtiss was guilty of no more than simple negligence. We note, particularly, testimony supporting Curtiss's recollection that, during the time he was working on his project at the University of Michigan, he and his co-workers had never prepared fibers coated with plastic having a higher index of refraction than the core and the statements in the record indicating that the plastic coating deteriorates with age. Both of these points support the contention that Curtiss had some basis to believe that the plastic-coated fibers he showed to the examiners were, in fact, the same fibers he had prepared several years earlier. We therefore approve the board's holding that Curtiss's negligence in this respect was not enough, by itself, to warrant striking his application. If it had been shown satisfactorily that the performance of plastic-coated fibers available to the art generally at the time Curtiss made his invention was significantly higher than the fibers actually demonstrated, *and* that Curtiss was aware of that fact at the time of the demonstration, we would be disposed to consider proof of this one negligent act as an element in establishing the existence of a state of mind so grossly irresponsible as to justify a holding of

fraudulent misconduct. Needless to say, such facts were not established, and thus Norton's charges must fail completely.

We must emphasize that while we have recognized the requirement that the provisions of Rule 56 be interpreted more broadly in this area of inequitable conduct, the rule as to burden of proof has not changed. Because of the importance of this issue, the courts have demanded that the *quantum* of proof as to fraud be substantial. The standard has been and still is that proof of fraud must be clear and convincing. Thus, the one asserting misconduct carries a heavy burden of persuasion. We have considered the evidence submitted by Norton in light of that burden, and are unable to hold that the Commissioner abused his discretion in refusing to strike the Curtiss application on the basis of such evidence. We now must consider the merits of the priority issue.

### *Norton's Priority Case*

Norton, as junior party, has the burden of proving priority by a preponderance of the evidence. He contends that he has met that burden by proving that he conceived the invention before Curtiss and that he either *actually* reduced it to practice before Curtiss or was diligent in reducing it to practice from a time before Curtiss's conception until his own reduction to practice. While a motion to amend Norton's preliminary statement to advance certain dates is in issue, we will initially consider the Norton priority evidence without regard to any limitations which might be imposed on his proofs if the action of the board, which denied that motion, is sustained.

The evidence shows that Norton is an eminent physicist who has been a consultant to American Optical Company in the fields of optics and glass technology since about 1954. He performed his duties on an informal basis. Thus he made

---

16. The board did make some statements which could be interpreted as indicating that they thought that Exhibit 23 was below the level of performance known to the art. No explicit finding regarding such level was made, however, and we decline to read one into the board's language.

fairly regular visits to the AO laboratories observing the activities and talking to the employees and making suggestions as he saw fit.

It was known prior to the conception of the invention by either party that glass fibers conduct light from one end to the other. It was also known that a bundle of such fibers having matching spatial arrangements of the fibers at the pick-up and viewing ends would transmit an image even though the bundle was bent, but this construction had not been used successfully because the image transmitted was always blurred. One factor contributing to such blurring was an effect, known as "cross-talk", whereby light leaked from fiber to fiber so as to impair contrast between different parts of the image. The problem of cross-talk had been reduced to some extent by coating the individual fibers with a plastic or resinous material having a lower index of refraction than the glass of the fiber.

J. W. Hicks, a physicist at AO, was in charge of a fiber optics program there and assigned to work on a contract in that field which AO had with the government. He was devoting a major portion of his time to the preparation of bundles of glass fibers coated with plastic having a lower index of refraction as early as the summer of 1956 when he first met Norton.

The record establishes that Norton made one of his visits to the AO laboratory on October 9 and 10 of 1956. A notebook kept by Norton indicates that he saw a set-up whereby Hicks was drawing glass fibers (uncoated) from a furnace and states:

> Suggest making bundle of large (.030″) coated fibers. Then pull down to .001″ as tubes are made.

It is on this entry, which is uncorroborated, and following events, that Norton bases a claim to October 9, 1956 for conception.

Norton testified that he discussed his idea shortly after this entry with Brian O'Brien, Director of Research at AO, Stephen McNeille, Assistant Director, Hicks and possibly one Walter Siegmund.

O'Brien testified that he remembered the circumstances when a suggestion by Norton relating to "drawing of multiple coated fibers" was made. While he initially could only place the suggestion in the fall of 1956, he ultimately, in response to what the board correctly regarded as leading questions, stated the date was October 10, 1956. O'Brien did not list Hicks as present when Norton's suggestion was made but stated that he described the disclosure to Hicks and urged that he consider how to do something about it. O'Brien also stated that he later asked Lee Upton, chief glass technologist for AO, how they were going to get the rods that Norton wanted to use.

McNeille emphasized that Norton's suggestion dealt with drawing "multiple clad fibers" so as to require fewer subsequent assembly processes to attain a bundle of fibers and that the suggestion involved clad or unclad fibers. He referred to the suggestion as involving either drawing the fibers from a multiplicity of rods and thereafter dipping them in "plastic coating material" or drawing the fibers from rods already coated. He did not recall any specific suggestion as to the type of cladding materials to be employed.

Hicks testified that Norton made two "fairly similar" suggestions regarding drawing multiple fibers simultaneously. One was "to draw an array of fibers separately, that is without fusing them together," by some means "still unknown" to Hicks to retain their alignment. The other suggestion was "to fuse these fibers together and draw them in a fused array." He placed the time of the suggestion at between September of 1956 and February of 1957.

It is established from the testimony of Hicks, Upton and Bazinet, the latter a technician working under Hicks, that an attempt was made at AO in the late fall of 1956 or the winter of 1956–57 to clad glass on glass fibers. Hicks testified

that they were trying to follow a suggestion of Upton [17] which consisted of

> taking a round polished rod and a tube with moderately good fit between the rod and tube, heat these up in a furnace, draw vacuum and sort of zone fuse the tube on the rod.

Hicks further stated:

> I believe at that time Norton's suggestion was to dip a glass rod in a melt and pull up the cladding, pull it up out of the melt and leave the cladding on the rod, which seemed unpractical and still seems fairly impractical.

After overcoming difficulties in obtaining round rods, Hicks constructed a special three-zone furnace, and Hicks, Upton and Bazinet did attempt to produce glass-clad glass fibers according to Upton's suggestion in January of 1957. The experiment seemed to be going well with the glass of the tube collapsing on the rod when the experimenters went out to lunch. Upon returning, however, they found that the furnace apparently had overheated and the glass assembly curled around the liner of the furnace and stuck to it. The product was a coarse, coated fiber about a tenth of an inch in diameter roughly in the shape of a helix. Irritated at having spoiled the work, Hicks took down the machinery and threw it into the corner of the room. Three or four weeks later, Hicks chipped out some of the coated glass, a few inches in length, and he and Bazinet redrew it in another furnace into a fiber and made a comparison test with plastic coated fibers. Hicks had "no recollection" of the measurements of it.

Bazinet described the experiment following the procedure suggested by Upton as "unproductive". He also testified regarding tests made between February 13 and March 26, 1957, on what was apparently the fiber produced from the output of the "unproductive" experiment. The tested fiber was described as "a bad fiber, which probably had a bad interface" (the region between the core glass and the cladding) and as having "an excessive loss of light." In a contemporary memo of Hicks dated April 4, 1957, Hicks stated that the cladding job on the fiber was "poor" and that the fiber was "too brittle". Bazinet called it "pretty bad" compared to plastic coated fibers tested.

The record also shows that Norton became "a little impatient that * * * [his] idea was not being carried out more rapidly" and performed an experiment of his own in this spring of 1957. He first bundled 16 *uncoated* rods together in "a four-by-four array", the rods not being welded together, and drew them down individually into a series of 16 fibers. The resulting fibers were not in any way attached to each other and "were useless for the purpose." In a second experiment he welded the rods together very lightly and then drew them down in a series of operations to produce a group of fibers related similarly to the original rods. Norton reported these experiments to McNeille in a letter dated April 5, 1957. Shortly thereafter Norton took specimens from the experiments to AO where he displayed them to McNeille, Hicks and O'Brien and conferred with patent counsel apparently on April 10, 1957. A first draft of the Norton patent application was transmitted to Norton by patent counsel on April 23, 1957. That draft is directed almost exclusively to a process in which a group of glass-coated rods are fused together and drawn together in that state. Its disclosure is consistent with the Norton notebook memo of October 9, 1956, and discloses that the coatings of the multi-fiber unit are fused to each other. Certain revisions and an additional conference between patent counsel and Norton took place before the application was filed on July 3, 1957.

17. Upton derived this suggestion from a process he had previously patented for coating glass on glass in making an hermetically sealed electrical resistance unit. (Patent No. 2,623,145, issued December 23, 1952).

The board concluded that this evidence did not prove that Norton had conceived the invention of the counts prior to April 1957. The board was also not satisfied that Norton had been diligent in reducing to practice beginning prior to April 10, 1957, or that he had actually reduced the invention to practice prior to his filing date, July 3, 1957.

We find no reversible error in those conclusions.

Norton's cryptic notebook entry of October 9, 1956 obviously lacks many features of the counts. Thus, it does not specify the material of the coating, that the coating is of substantially uniform thickness, that the coating is fused to the entire outer surface, or that it has an index of refraction which is lower than the glass core and is adapted to prevent light from escaping from the core into the coating. Neither is it specified that the coated fibers are flexible. It is true that providing glass fibers with plastic coatings is an effort to reduce leakage between fibers in an array was known. It is also true that O'Brien in describing Norton's oral description of his concept supplied the additional factor that the coating was to be of glass having a lower index of refraction than the core. However, O'Brien's testimony, as well as the notebook entry and the testimony of the others involved, demonstrate clearly that Norton's concept concerned drawing multiple fibers from an array of rods so as to preserve the relationship of the individual elements and facilitate the assembly of a fiber optic device with its many thousands of individual fibers properly oriented. In fact, when Norton undertook to prove out his invention in his own laboratory around April of 1957, he used uncoated rods and paid no attention to the various characteristics of the invention in issue recited in the counts and missing from his written disclosure.

After Norton's disclosure in October 1956, Hicks continued in the optical fiber work on which he was already embarked. He made no attempt to follow Norton's multiple-fiber drawing technique. While he did proceed to an experiment with glass coating, he considered the work to be Upton's "baby" and had Upton participate in the experiment for that reason. The distorted piece of clad glass that resulted when that experiment went wrong obviously lacked most of the features of the count, including the size. The fiber later drawn from a part of that piece by Hicks and Bazinet, which is really the only fiber relied on for a reduction to practice, obviously was not a satisfactory fiber. It plainly is inadequate to show either conception or reduction to practice at the time, which the record fixes as between February 13 and March 26, 1957.

Norton's own experiment carried out around April 5, 1957 involved unclad fibers and likewise would be inadequate, even if corroborated, to show either conception or reduction to practice.

Since the next event was the conference of Norton with others including AO patent counsel, on April 10, 1957, it is apparent that conception has not been proved prior to that date. Also, since no other acts after the Hicks-Bazinet tests are advanced by Norton as showing actual reduction to practice before Norton's July 3, 1957 filing date, the board correctly restricted Norton to that date for reduction to practice.[18]

The board's decision is affirmed.

Affirmed.

RICH, J., concurs in the result.

18. Since we have considered Norton's priority evidence, in the same manner as did the board, without regard to any limitations which might have been imposed thereon as a result of his motion to amend his preliminary statement being denied, and have still concluded that the award of priority was correct, any issue regarding that denial is moot.